**No. 14-73502**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

JOHN BRENNAN,

Petitioner

v.

U.S. DEPARTMENT OF HOMELAND SECURITY and TRANSPORTATION
SECURITY ADMINISTRATION,

Respondent
_____

ON JUDICIAL REVIEW OF A FINAL ORDER
OF THE U.S. DEPARTMENT OF HOMELAND SECURITY,
TRANSPORTATION SECURITY ADMINISTRATION
_____

PETITIONER'S EXCERPTS OF RECORDS

submitted by:
Michael E. Rose
Of Attorneys for Petitioner
CREIGHTON & ROSE, PC
500 Yamhill Plaza Building
815 SW Second Avenue
Portland, Oregon 97204-3005
Tel.: (503) 221-1792
Fax: (503) 223-1516
E-mail: mrose@civilrightspdx.com

EXCERPT OF RECORD

TABLE OF CONTENTS

Petition for Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ER - 1

ALJ Initial Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ER - 3

Final Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ER - 37

Excerpt of Transcript. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ER - 46

United States Court of Appeals
for the
NINTH CIRCUIT

| | | |
|---|---|---|
| JOHN BRENNAN, | ) | |
| | ) | |
| Petitioner | ) | Agency Docket No. 12-TSA-0092 |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND | ) | |
| SECURITY, TRANSPORTATION | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Respondent | | |

### PETITION FOR REVIEW

Petitioner John Brennan hereby petitions the court for review of the Order of the

U.S. Department of Homeland Security, Transportation Security Administration, holding

that he violated 49 CFR §1540.109 and assessing a civil penalty, entered on 18

September, 2014.

Date: 13 November, 2014

<div style="margin-left:40%">

*s/ Michael E. Rose*
Michael E. Rose, OSB No. 753221
CREIGHTON & ROSE, PC
500 Yamhill Plaza Building
815 SW Second Avenue
Portland, Oregon 97204-3026
Tel.: (503) 221-1792
Fax: (503) 223-1516
E-mail: mrose@civilrightspdx.com
Of Attorneys for Petitioner

</div>

CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the

United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system

on November 13, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be

accomplished by the appellate CM/ECF system.

/s/ Michael E. Rose
Michael E. Rose, OSB #753221
Of Attorneys for Petitioner

UNITED STATES OF AMERICA
DEPARTMENT OF HOMELAND SECURITY
TRANSPORTATION SECURITY ADMINISTRATION

| | | |
|---|---|---|
| In the Matter of: | ) | Docket No. |
| | ) | 12-TSA-0092 |
| John Brennan, | ) | |
| | ) | Decision and Order |
| Respondent. | ) | |
| | ) | |

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 2
II.     PROCEDURE ....................................................................................................... 2
III.    FINDINGS OF FACT ........................................................................................... 3
IV.     DISCUSSION ....................................................................................................... 6
        A.   Constitutional Issues ................................................................................ 6
        B.   Law Regarding Screening ......................................................................... 9
        C.   Definition and Analysis of "Interference" .............................................. 11
             1.   Is the Regulation Overbroad? ........................................................... 12
             2.   Did Respondent's Actions Constitute Interference? ......................... 12
             3.   Fourth Amendment Claims ................................................................ 15
             4.   First Amendment Claims ................................................................... 16
                  a.   Relevant Law as to First Amendment Claims ............................ 16
                  b.   Applicability of *Tobey v. Jones* ............................................... 18
             5.   Analysis ............................................................................................. 21
        D.   Conclusion .............................................................................................. 22
V.      CONSIDERATION OF AN APPROPRIATE PENALTY .................................... 22
        A.   TSA's Argument concerning Sanction .................................................... 24
        B.   Respondents Argument concerning Sanction .......................................... 24
        C.   Analysis .................................................................................................. 25
             1.   Significance or Degree of Security Risk Created by the Violation ....... 25
             2.   The Nature of the Violation ............................................................... 26
             3.   Past Violation History ....................................................................... 26
             4.   The Violator's Level of Experience .................................................... 26
             5.   The Attitude of the Violator ............................................................... 26
             6.   Whether a Criminal Sanction has Already Been Assessed for the Same
                  Incident ............................................................................................. 27
             7.   Whether the Violator was Disciplined by his or her Employer for the Same
                  Incident ............................................................................................. 27
             8.   Whether the Violator Engaged in Artful Concealment, Fraud, and/or Intentional
                  Falsification ...................................................................................... 27
             9.   The Economic Impact of the Civil Penalty on the Violator .................. 27

    **D.**    **Conclusion** ................................................................................................ 28

**ORDER** ................................................................................................................ 28

**APPENDIX A: APPEAL RIGHTS** ..................................................................... I

**APPENDIX B: WITNESSES AND EXHIBITS** ..................................................... V

<u>**DECISION AND ORDER**</u>

## I.  INTRODUCTION

The Transportation Security Administration (TSA or Agency) filed a Complaint alleging John Brennan (Respondent) violated Transportation Security Regulations by interfering with screening personnel in the performance of their duties at Portland International Airport (PDX or Airport). TSA seeks a $1,000.00 civil penalty. Respondent denies the allegations on several grounds, including that his actions did not constitute interference but were instead symbolic speech protected by the First Amendment. Based on the evidence developed at the hearing and considering the whole record including the parties' arguments, I find the allegations proved and a $500.00 civil penalty appropriate in this matter.

## II. PROCEDURE

On September 26, 2012, Respondent requested a hearing after receiving a notice of an alleged violation of Transportation Security Regulations. TSA filed a Complaint setting out its allegations on October 17, 2012. On October 22, 2012, the Acting Chief Administrative Law Judge assigned the matter to me for adjudication. Respondent, through counsel, filed an Answer on November 14, 2012 denying the allegations of interference with screeners and setting out several affirmative defenses relating to freedom of speech under the First Amendment.

The hearing took place on May 14, 2013 in Portland, Oregon. The Agency, represented by Susan Conn, Esq., offered five (5) witnesses. Respondent was represented by Robert Callahan, Esq. and testified on his own behalf. TSA introduced four (4) exhibits at the hearing,

and Respondent introduced three (3) exhibits; all exhibits were admitted. After the hearing, both

parties filed proposed findings of fact, conclusions of law, and argument in support of their

respective positions. Separate orders with my rulings on these are being issued simultaneously

with this Decision. The record is now closed and this matter is ripe for decision.

## III. FINDINGS OF FACT

1. On or about April 17, 2012, Respondent was a ticketed passenger on Alaska Airlines flight #2617 departing from the Portland International Airport (PDX) in Portland, Oregon. (Respondent's Answer at ¶ 2).

2. Respondent is a frequent traveler. (Tr. at 151).

3. On April 17, 2012, at approximately 5:30 PM, Respondent arrived at the PDX TSA "ABC" Checkpoint. (Respondent's Answer at ¶ #3).

4. There are eight lanes for screening at the ABC Checkpoint. (Tr. at 17).

5. Screening is conducted by TSA Transportation Security Officers (TSOs). (Tr. at 10-12).

6. PDX uses Advanced Imaging Technology (AIT) screening as the primary method of screening passengers. (Tr. at 18).[1]

7. PDX uses millimeter wave imaging as its primary screening tool, with a walk-through metal detector as backup for families with small children or people with medical conditions that prevent them from using the AIT screening booths. (Tr. at 18, 41).

8. Millimeter wave scanners have privacy software called "Automatic Target Recognition" (ATR) that eliminates passenger-specific images and instead indicates the location of potential threats on a generic human figure. (Tr. at 18).

9. Passengers have the option of opting out of AIT screening and being screened using a pat-down technique. (Tr. at 13, 20).

10. On April 17, 2012, Respondent chose to opt out of the Advanced Imaging Technology (AIT) screening. (Tr. at 154-55).

11. It was Respondent's "standard practice" to opt out of AIT or "non-metal detectors" screening, and he was familiar with the procedures. (Tr. at 153-54).

---

[1] In April of 2012, TSA used two types of AIT screening in various airports: backscatter X-ray and millimeter wave. However, PDX has never been equipped with backscatter X-ray machines. (Tr. at 20, 43)

12.     When Respondent chose to opt out of the AIT screening, he was referred to TSO Steven Van Gordon for a pat-down. (Tr. at 22-23).

13.     TSO Van Gordon explained the pat-down procedure to Respondent. (Tr. at 22).

14.     TSO Van Gordon offered Respondent the opportunity to have the pat-down conducted in a private area but Respondent declined because he did not feel he needed privacy. (Tr. at 156).

15.     While the pat-down was taking place, Respondent quietly narrated what was occurring. He does this every time he receives a pat-down, as he believes there is no prohibition against it and it provides a "degree of comfort" for him and helps him notice when the pat-down routines are inconsistent. (Tr. at 157-58).

16.     TSO Van Gordon heard Respondent's recitation and found it unusual, but it did not prevent him from conducting the pat-down. (Tr. at 25, 45).

17.     After the pat-down, TSO Van Gordon conducted Explosive Trace Detection (ETD) screening on the gloves he used on the pat-down. (Tr. at 26-27).

18.     The ETD machine is used to detect elements that may indicate an explosive is present or the person or goods in question may have been in contact with an explosive. (Tr. at 16).

19.     The ETD screening resulted in an alarm. (Tr. at 27).

20.     TSO Van Gordon called for his supervisor in accordance with TSA procedures. (Tr. at 28).

21.     Respondent did not personally hear the alarm, but noticed increased activity around the machine. (Tr. at 156, 159).

22.     Under TSA screening procedures, an ETD alarm requires a secondary screening of the passenger and their accessible property. (Tr. at 28).

23.     Supervisory Transportation Security Officer (STSO) Jerry Nichols responded to TSO Van Gordon's request for a supervisor. (Tr, at 28, 67).

24.     STSO Nichols informed Respondent he had tested positive for nitrates and that additional screening was necessary. (Tr. at 29).

25.     Nitrates are found in many conventional products, including fertilizer, and are also found in some common explosives. (Tr. at 47).

26.     Respondent said "I guess I have to show you I'm not hiding anything" and removed all of his clothing. (Tr. at 30, 69, 162-165).

27.     Respondent dropped his clothes on the floor. (TSA Ex. A (Video); Tr. at 62-63, 99).

4

28. No one employed by TSA ever asked or directed Respondent to remove his clothing during the pat-down. (Tr. at 167).

29. Respondent initially testified his motivation for undressing was to prove he was not carrying a bomb, and he believed the fastest way to get to his gate and continue with his trip was to show TSA personnel he did not have any explosives on his person. (Tr. at 162).

30. Respondent then stated his actions were a form of protest. (Tr. at 116, 163, 167-68).

31. Respondent further stated he was tired of being hassled, meaning he feels the screening system is inflexible and violates his constitutional right to privacy. (Tr. at 116, 163-64).

32. Respondent believes TSA "routinely see[s] people naked through the scanning machines and . . . the difference between a naked image and a naked person isn't that great . . ." He based this belief on information he had seen on websites and online blogs. (Tr. at 170).

33. It is TSA policy not to touch passengers' bare skin, but only to pat them down through clothing. (Tr. at 32).

34. Likewise, the secondary EDT screening cannot be conducted on a passenger's bare skin. (Tr. at 32).

35. TSA personnel directed Respondent to put his clothes back on at least three times and Respondent refused. (Tr. at 169).

36. Respondent stated he didn't have to put his clothes back on and that he had checked and it was not illegal. (Tr. at 70, 75).

37. STSO Nichols requested the primary Supervisory Transportation Security Officer, STSO David, to call the port police. (Tr. at 91).

38. STSO David called the Port Police and notified the TSA Oregon Coordination Center. (Tr. at 91-92).

39. STSO David closed the entire checkpoint and diverted personnel to move bins to block the public view of Respondent. (Tr. at 94, 96).

40. Port of Portland Police arrived on scene and also requested twice that Respondent put his clothes back on. (Tr. at 170).

41. Respondent refused and told police his actions were not illegal. (Tr. at 112).

42. Portland Port Police arrested and removed Respondent from the screening area. (TSA Ex. A (Video); Tr. at 115).

43.    The secondary screening was not conducted because the Port Police escorted Respondent away and took possession of Respondent's clothing and property. (Tr. at 60-61).

44.    ABC Checkpoint reopened after being closed for approximately three minutes. (Tr. at 95).

45.    A criminal complaint of indecent exposure was brought against Respondent in Oregon state court. (R. Ex. 3, Tr. at 164-65).

46.    The Circuit Court of the State of Oregon for Multnomah County issued a Judgment of Acquittal on a finding of Not Guilty to a single misdemeanor charge on July 18, 2012. (R. Ex. 1; Tr. at 166-67).

47.    Respondent's employer fired him from his job as a result of this incident. (Tr. at 150).

## IV. DISCUSSION

The following facts of this matter are not seriously in dispute: Respondent was a ticketed passenger who began the screening process and opted out of AIT screening, as permitted under TSA regulations. A pat-down screening was performed and the ETD machine utilized as part of the pat-down screening indicated the presence of nitrates. While STSO Nichols does not remember telling Respondent that he tested positive for nitrates, TSO Van Gordon and Respondent both testified that STSO Nichols did so. Respondent then stripped his clothes off and remained naked for approximately three minutes until he was removed by Port of Portland Police. Both TSA Transportation Security Officers and Port of Portland Police Officers directed Respondent to put his clothes back on during this time and Respondent refused. Finally, there is no dispute that TSA did not conduct the secondary screening required by the ETD alarm.

### A. Constitutional Issues

Respondent raises several constitutional issues:

- The Transportation Security Regulation at 49 CFR § 1540.109 is impermissibly vague and overbroad as applied to his situation.

- The TSA screening procedures at issue here violate his Fourth Amendment rights in that the search of Respondent was unwarranted and excessive under these circumstances.

- Respondent's conduct in disrobing at the TSA checkpoint is protected political speech under the First Amendment to the United States Constitution and cannot be infringed upon in this instance, even by the government. To support his position, Respondent relies significantly on a recent Fourth Circuit decision, *Tobey v. Jones*, 706 F.3d 379 (4th Cir. 2013).

TSA asserts Respondent's constitutional claims are beyond the scope of an administrative law hearing. The APA and TSA regulations set forth the powers of an administrative law judge. 5 U.S.C. § 556(c) and 49 C.F.R. § 1503.607. There are also specific limitations on the powers of an ALJ when adjudicating TSA cases:

> (1) The ALJ may not:
> (i) Issue an order of contempt.
> (ii) Award costs to any party.
> (iii) Impose any sanction not specified in this subpart.
> (iv) Adopt or follow a standard of proof or procedure contrary to that set forth in this subpart.
> (v) Decide issues involving the validity of a TSA regulation, order, or other requirement under the U.S. Constitution, the Administrative Procedure Act, or other law.
> (2) If the ALJ imposes any sanction not specified in this subpart, a party may file an interlocutory appeal of right pursuant to § 1503.631(c)(3).
> (3) This section does not preclude an ALJ from issuing an order that bars a person from a specific proceeding based on a finding of obstreperous or disruptive behavior in that specific proceeding.
>
> 49 C.F.R. § 1503.607(b).

7

Although an administrative law judge may not opine as to the validity of agency regulation, order, or other requirement, judges may sometimes have to address constitutional questions in order to render a decision or maintain an adequate administrative record.

> Often the agency, its administrative judges or officials must confront constitutional questions. Agencies have an obligation to address constitutional challenges to their own actions in the first instance. In such cases, administrative authorities must make preliminary constitutional decisions in order to proceed. An agency must consider these constitutional questions in order to make its own decisions. Such constitutional decisions not only do not interfere with judicial review but also have beneficial consequences, such as administrative correction of constitutional error, developing a record for review and giving the court the benefit of the agency's reasoning.
>
> Charles H. Koch Jr., Administrative Law and Practice, Vol. 4, § 11:11 (3d ed. West 2010).[2]

The principal issue before me is whether Respondent's actions constituted interference with TSA screeners. While Respondent argues that the Transportation Security Regulations at 49 CFR § 1540.109 are impermissibly vague and overbroad as applied to his situation, the constitutional validity of TSA regulations is beyond the reach of an administrative law judge. 49 C.F.R. § 1503.607(b)(1)(v). Respondent also argues his actions did not interfere with the screening process. Although the constitutionality of the regulation is not before me, I must nevertheless consider Respondent's claims to the extent necessary to determine whether his actions constituted interference. I will also consider Respondent's First Amendment claims from the standpoint of whether his conduct was Constitutionally-protected symbolic speech and, if so, whether the allegation of interference is appropriate. This will create an adequate record for review and give any reviewing court the benefit of the agency's reasoning.

---

[2] *See McBryde v. Comm. to Review Circuit Council Conduct and Disability Orders of Judicial Conf. of U.S.*, 264 F.3d 52, 62 (D.C. Cir. 2001), *cert. denied*, 537 U.S. 821 (2002); *Riggin v. Office of Senate Fair Employment Practices*, 61 F.3d 1563, 1569–1570 (Fed. Cir. 1995), *cert. denied*, 516 U.S. 1072 (1996).

**B. Law Regarding Screening**

Congress mandates the Transportation Security Administration "shall provide for the screening of all passengers and property, including . . . carry-on and checked baggage, and other articles, that will be carried aboard a passenger aircraft operated by an air carrier or foreign air carrier in air transportation or intrastate air transportation." 49 U.S.C. § 49901(a). The purpose of such screening is "establishing whether the passenger is carrying unlawfully a dangerous weapon, explosive, or other destructive substance." 49 U.S.C. § 44902(a)(1).

The courts, including the Ninth Circuit, have held that airport screening searches are "constitutionally reasonable administrative searches because they are 'conducted as part of a general regulatory scheme in furtherance of an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings'. *United States v. Davis,* 482 F.2d 893, 908 (9th Cir.1973); *see also United States v. Hartwell,* 436 F.3d 174, 178 (3d Cir.), *cert. denied,* 549 U.S. 945 (2006); [*United States v. Marquez,* 410 F.3d 612, 6165 (9th Cir. 2005)]" *United States v. Aukai,* 497 F.3d 955, 960 (9th Cir. 2007) (parallel citations omitted). The record establishes that Respondent elected to attempt entry into the screening area of Portland International Airport when he placed his shoes, belt, jacket and accessible property on the conveyor belt and opted out of the AIT processes, thereby subjecting himself to the airport screening process. *See Aukai* at 962. TSA screeners are limited to the single administrative goal of searching for possible safety threats related to weapons or explosives. The constitutional bounds of an airport administrative search require that the individual screener's actions be no more intrusive than necessary to determine the existence or absence of weapons or explosives that could result in harm to the passengers and aircraft. *See United States v. McCarty*,

648 F.3d 820, 831 (9th Cir. 2011). The record establishes TSOs Van Gordon and Nichols clearly limited their administrative search to those concerns.[3]

In 2004, Congress further directed the TSA to "give a high priority to developing, testing, improving, and deploying" at airport screening checkpoints a new technology "that detects nonmetallic, chemical, biological, and radiological weapons, and explosives, in all forms." Intelligence Reform and Terrorism Prevention Act of 2004, 49 U.S.C. § 44925(a). In response, TSA began utilizing two separate technologies, known as backscatter X-ray and millimeter-wave. These have gradually been replacing walk-through metal detectors as the primary screening tools at most airports.

Backscatter X-ray technology generated a true image of the body of the passenger undergoing screening, and was viewed by an agent in a separate booth. Millimeter-wave technology, on the other hand, generates a "gingerbread man" figure on a screen visible to both the TSA agent and the passenger. This figure is identical for men and women. If the machine detects an unusual object, the screen will display a box around that portion of the generic figure, and the TSA agent will conduct a localized pat-down of that area to determine whether a prohibited item is present. After the passenger clears screening, the image is deleted and cannot be retrieved. (Tr. at 18-21).

TSA has promulgated regulations implementing its screening program in 49 C.F.R. Part 1540. "No individual may enter a sterile area or board an aircraft without submitting to the screening and inspection of his or her person and accessible property in accordance with the procedures being applied to control access to that area or aircraft" 49 C.F.R § 1540.107(a) Furthermore, "[n]o person may interfere with, assault, threaten, or intimidate screening personnel

---

[3] In his brief, Respondent states "the TSA screening procedures at issue here are a violation of his Fourth Amendment. rights in that the search of Respondent was unwarranted and excessive under these circumstances." Resp. Brief at 8. Neither the record nor his brief set forth any specific argument in this area, though.

in the performance of their screening duties under this subchapter." 49 C.F.R § 1540.109. In the

preamble to the rule establishing the regulation in question, TSA stated -

> Section 1540.109 is a new requirement prohibiting any person
> from interfering with, assaulting, threatening, or intimidating
> screening personnel in the performance of their screening duties.
> .... The rule prohibits interference that might distract or inhibit a
> screener from effectively performing his or her duties. This rule is
> necessary to emphasize the importance to safety and security of
> protecting screeners from undue distractions or attempts to
> intimidate.

> A screener encountering such a situation must turn away from his
> or her normal duties to deal with the disruptive individual, which
> may affect the screening of other individuals. The disruptive
> individual may be attempting to discourage the screener from
> being as thorough as required. The screener may also need to
> summon a checkpoint screening supervisor and law enforcement
> officer, taking them away from other duties. Checkpoint
> disruptions potentially can be dangerous in these situations. This
> rule supports screeners' efforts to be thorough and helps prevent
> individuals from unduly interfering with the screening process.
> This rule is similar to 14 CFR 91.11, which prohibits interference
> with crewmembers aboard aircraft, and which also is essential to
> passenger safety and security.

> 67 Fed. Reg. 8340-01 (Feb. 22, 2002), *amended by* 68 Fed. Reg.
> 49718-01 (Aug. 19, 2003).

The preamble further states that passengers are subject to civil penalties for disruptions of the

screening process. *Id.*

### C. Definition and Analysis of "Interference"

Respondent claims TSA's definition of "interfere" as implied in this TSA prosecution

renders 49 CFR § 1540.109 overbroad as applied to Respondent, and that in any case his actions

did not constitute interference under common definitions of "interfere." TSA argues that the

preamble to the rulemaking promulgating 49 CFR § 1540.109 clearly states the intent of the

regulation is to prohibit distraction to screeners at the security checkpoint. The Agency's position

is that Respondent's actions created such a distraction; he refused to comply with TSO directions; and due to these factors he failed to complete the screening process.

### 1. Is the Regulation Overbroad?

Respondent argues the Transportation Security Regulation at 49 CFR § 1540.109 is impermissibly vague and overbroad as applied to his situation. TSA rules specifically prohibit ALJs from deciding "issues involving the validity of a TSA regulation, order, or other requirement under the U.S. Constitution, the Administrative Procedure Act, or other law." 49 C.F.R. § 1503.607(b)(1)(v). Therefore, Respondent's argument on this point is not properly before me. However, I note that at least one court of competent jurisdiction has reviewed the issue and found 49 C.F.R. § 1540.109 was neither vague nor overbroad. *Rendon v. Transp. Sec. Admin.*, 424 F 3d 475 (6th Cir. 2005).

Although the constitutionality of the regulation is not before me, I must nevertheless interpret the language of 49 C.F.R. § 1540.109 to determine whether Respondent's actions constitute interference.

### 2. Did Respondent's Actions Constitute Interference?

Respondent is charged with violating this regulation by "interfering" with TSA personnel in the performance of their screening duties by removing his clothes during his resolution screening, refusing to comply with the TSA screener's request to put his clothes back on, or both. Respondent argues that his actions did not constitute interference. In his brief, Respondent asserts that "interfere" is defined as:

> 1: to strike one foot against the opposite foot or ankle in walking or running - used especially of horses

12

> 2: to come in collision: to be in opposition: to run at cross-purposes:
> CLASH *interfering claims* - used with *carbon dioxide interferes
> with the liberation of oxygen to the tissues- H.G.Armstrong*
> 3: to enter into or take a part in the concerns of others:
> INTERMEDDLE, INTERPOSE, INTERVENE
> 4 obsolete : to run into another or each other: INTERSECT
> 5: to act reciprocally so as to augment, diminish, or otherwise affect
> one another - used of waves
> 6: to claim substantially the same invention and thus question the
> priority of invention between the claimants - distinguished from
> infringe
> 7 of a football player a: to run ahead of the ball-carrier and provide
> allowed blocking protection for him b: to hinder illegally an attempt
> of a player to *receive* a pass or make a fair catch of a punt
>
> Webster's Third New International (unabridged).

Resp. Brief at 9-10. Respondent asserts that "[f]rom the available choices of the definitions

above, the second seems the most appropriate to apply in interpreting the TSA's regulation: 2: to

come in collision: to be in opposition: *to run at cross-purposes:* CLASH *interfering claims*

(emphasis added)." Resp. Brief at 10.

      Respondent appears to presuppose the definitions he cites are most authoritative, but

other, equally legitimate definitions of the terms "interfere" and "interference" exist. In two

recent decisions, separate panels of the Ninth Circuit held the terms as used in similar regulations

include hindering government employees in performing their official duties and refusing to

comply with instructions of government employees performing their official duties. In *United

States v. Willfong*, 274 F.3d 1297 (9th Cir. 2001), the court stated, although courts have not

expressly defined "interference" under the Forest Service regulation at issue there:

> Without prior interpretation, this court should apply the common
> meaning of a word. *See Hoff,* 22 F.3d at 223. To "interfere" is to
> "oppose, intervene, hinder, or prevent." WEBSTER'S NEW
> WORLD DICTIONARY 704 (3d College ed.1998). " '[I]nterfere'
> has such a clear, specific and well-known meaning as not to

> require more than" the use of the word itself in a criminal statute. *United States v. Gwyther,* 431 F.2d 1142, 1144 n. 2 (9th Cir.1970).

> *Id.* at 1301.

Similarly, in *United States v. Bucher*, 375 F.3d 929 (9th Cir. 2004), another panel interpreted the meaning of interference and held that regulatory interpretation should involve first looking to the plain language of the regulation and presuming "the drafters said what they meant and meant what they said." Unless a plain-language reading would lead to "absurd results," it should control. The court continued,

> The term "interfere" is unambiguous and is defined as "to oppose, intervene, hinder, or prevent." *Willfong,* 274 F.3d at 1301 (quoting WEBSTER'S NEW WORLD DICTIONARY 704 (3d College ed.1998)). Similarly, "interference" means an "act of meddling in another's affairs ... [a]n obstruction or hindrance." Black's Law Dictionary, 818 (7th ed.1999). Under these definitions, it is impossible to separate government employees from their duties under § 2.32(a)(1). One who interferes with an employee's official duties "meddles" in that employee's "affairs," thus interfering with the employee herself. Similarly, one who interferes with a government employee who is engaged in an official duty has necessarily compromised the performance of those duties.

> *Id.* at 932.

The *Bucher* court considered the regulatory history and stated that when the regulation in question was enacted in 1983, the National Park Service stressed "that [the provision] "is necessary to ensure that *government operations* proceed without interference."

Moreover, the Sixth Circuit has specifically considered TSA's use of the term "interfere" and held "by using the term interfere, 49 C.F.R. § 1540.109 prohibits only that conduct which poses 'an actual hindrance to the accomplishment of a specified task.' *Fair v. Galveston*, 915 F.Supp. 873, 879 (S.D.Tex.) (distinguishing the use of the term "interrupt" from the narrower term 'interferes')." *Rendon*, 424 F 3d at 480.

Accordingly, based on the plain meaning of the terms "interfere" and "interference," the interpretations of the Ninth and Sixth Circuits, and the regulatory history of 49 C.F.R. § 1540.109, the terms include actions that hinder or distract screeners in the performance of the screening process, as well as refusal to comply with directions given by screeners. TSA has not alleged, nor do I find, that Respondent's narration of the pat-down was interference. TSO Van Gordon was clearly able to continue the pat-down without being hindered or unduly distracted by Respondent's speech.

Respondent's actions in stripping and dropping his clothes on the floor and refusing to comply with TSO Nichols and TSO Van Gordon's directions, however, constituted interference with their duties. TSA screening procedures required the TSOs to conduct a secondary screening due to the ETD alarm indicating nitrates were present. By dropping his clothes on the floor, Respondent presented an actual hindrance to the accomplishment of that task. The distraction caused by Respondent's actions required STSO David to shut down the checkpoint and divert other TSOs to this incident compromised their ability to perform their screening duties.

### 3. Fourth Amendment Claims

Respondent argues "the TSA screening procedures at issue here are a violation of his Fourth Amendment rights in that the search of Respondent was unwarranted and excessive under these circumstances." Resp. Brief at 8. Aside from Respondent's testimony that he stated he did not consent to the screening but did not think TSA employees heard him, neither the record nor his brief set forth any specific argument on this point. I have previously analyzed the law relevant to this area in the section entitled "Law Regarding Screening." *See United States v. Aukai*, 497 F.3d 955 and *United States v. McCarty*, 648 F.3d 820.

As noted above, the constitutional bounds of an airport administrative search require that the individual screener's actions be no more intrusive than necessary to determine the existence or absence of weapons or explosives that could result in harm to the passengers and aircraft. The record establishes TSOs Van Gordon and Nichols clearly and appropriately limited their administrative search. Respondent opted out of an AIT scan and subjected himself to a pat-down. "Airport screening searches . . . do not per se violate a traveler's Fourth Amendment rights, and therefore must be analyzed for reasonableness." *Gilmore v. Gonzales*, 435 F.3d 1125, 1138 (9th Cir. 2006). The evidentiary record shows the pat-down in question was no more intrusive than necessary to determine the existence or absence of weapons or explosives. I find no merit to Respondent's assertion that the search was unwarranted and excessive.

### 4. *First Amendment Claims*

Respondent argues his conduct in disrobing at the TSA checkpoint is protected political speech under the First Amendment to the United States Constitution and cannot be infringed upon in this instance, even by the government. To support his position, Respondent relies significantly on a recent Fourth Circuit decision, *Tobey v. Jones*, 706 F.3d 379. TSA asserts Respondent's First Amendment claim is beyond the scope of an administrative law hearing.

### a. Relevant Law as to First Amendment Claims

The First Amendment prohibits Congress from enacting laws "abridging the freedom of speech." U.S. Const. amend. I. "As a general rule, the First Amendment prohibits not only direct limitations on speech but also adverse government action against an individual due to her exercise of First Amendment freedoms." *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999).

A bedrock First Amendment principle is that citizens have a right to voice dissent from government policies. *See Mills v. Alabama,* 384 U.S. 214, 218 (1966) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs"). The Supreme Court determined in *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992), that an airport terminal is a nonpublic forum and thus subject to reasonable time, place, and manner restrictions. *See also Mocek v. City of Albuquerque*, 2013 WL 312881 (D.N.M. Jan. 14, 2013).

The Supreme Court "has held that when 'speech' and 'non speech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the non speech element can justify incidental limitations on First Amendment freedoms" *United States v. O'Brien*, 391 U.S. 367, 376 (1968). The Court has also held that public nudity in and of itself does not constitute speech. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991).

The Sixth Circuit in *Rendon*, 424 F 3d 475, considered how certain First Amendment concerns applied to 49 C.F.R. § 1540.109, the same regulation in question here. In that case Mr. Rendon "interfered with the screener in the performance of his duties by actively engaging the screener with loud and belligerent conduct, and, after being asked not to use profanities, by exclaiming that the screener should be in a different line of work, that he should live in a bubble, and that it was a free country in which he could say what he pleased." *Rendon* at 479. The court held that a content-neutral regulation with incidental effects on speech is valid as long as the regulation is narrowly tailored to advance a substantial government interest. The court found that 49 C.F.R. § 1040.109

serves a substantial government interest, as its purpose is to
prevent individuals from interfering with screeners in the
performance of their duties, which are to both ensure that those
screened are not potentially carrying weapons and to conduct the
screening of passengers as efficiently as possible. Moreover, it
goes without saying that this regulation (prohibiting interfering
with screeners) directly and effectively advances the government's
interest in ensuring that screeners are not interfered with in the
performance of their screening.

Id.

Title 49 C.F.R. § 1540.109 "regulates speech only in the narrow context of when that
speech can reasonably be found to have interfered with a screener in the performance of the
screener's duties." *Rendon* at 480. The court found Rendon's conduct was such that "the screener
needed to shut down his line and call over his supervisor. Thus, [Rendon's] conduct interfered
with the screener's duty to both thoroughly screen passengers and to do so in an efficient
manner." *Id.*

b. Applicability of *Tobey v. Jones*

As noted above, Respondent relies significantly on a recent Fourth Circuit decision,
*Tobey v. Jones*, 706 F.3d 379, in supporting his constitutional claims. He states, "[m]ost cases
that have been reported involve conduct that is violent, abusive, assaultive conduct, or such
behaviors that few would dispute constitute 'interference.' However, one reported case involves
the conduct of a passenger that is factually closer to Respondent's conduct." Resp. Brief at 11.
For the reasons that follow, though, Respondent's reading of *Tobey* is problematic at best.

At the outset, I must note that *Tobey* was an appeal from denial of a Fed.R.Civ.P.
12(b)(6) motion to dismiss, not a decision on the merits. A court reviews motions under Rule
12(b)(6) by taking the allegations in the complaint as true and construing the facts alleged in the

18

complaint in the light most favorable to the plaintiff. Therefore, the facts set forth in the Fourth

Circuit's decision are from the vantage point of Mr. Tobey, with all reasonable inferences drawn

in his favor.

      As with this case, the allegations in *Tobey* did not involve "conduct that was violent,

abusive, or assaultive, or such behaviors that few would dispute constitute 'interference.'" Resp.

Brief at 11. Mr. Tobey brought an action in the United States District Court for the Eastern

District of Virginia against airport police and TSA agents, alleging violations of his First, Fourth,

and Fourteenth Amendment Equal Protection Clause rights. The TSA agents moved to dismiss

the claims, asserting qualified immunity. The district judge sustained the motion as to the Fourth

and Fourteenth Amendment claims, but denied the motion for the First Amendment claim. The

TSA agents appealed the denial to the Fourth Circuit Court of Appeals.

      The issue before the Fourth Circuit was whether Mr. Tobey alleged a facially valid First

Amendment claim, and if he did, whether qualified immunity barred such a claim because the

TSA officers did not violate a clearly established constitutional right. The Fourth Circuit did not

consider or make a finding on whether Mr. Tobey interfered with TSA screening. Rather, it

found the facts *as alleged by Mr. Tobey* "plausibly set forth a claim that the TSA agents violated

his clearly established First Amendment rights." *Tobey* at 383. The court stated this was

premised on Mr. Tobey's arrest and had nothing to do with TSA regulations. *Id.* at 389.

      In his brief, Respondent has put forth a reading of *Tobey* that is inconsistent with the

decision as written. He states, "In that case, passenger Aaron Tobey, while in the TSA security

screening process, stripped off his sweatshirt and pants revealing the text of the Fourth

Amendment written on his bare chest. He then began swinging his clothing 'wildly' over his

head while Mr. Tobey announced to the [TSA] his desire to 'peacefully protest' TSA screening

measures. Mr. Tobey defended his actions claiming, *inter alia,* that his conduct was protected speech under the First Amendment." Resp. Brief at 11. However, Respondent's version of events is not factual; instead, it is drawn from part of the decision which merely speculates on what evidence could potentially be developed if the case went forward to a hearing.[4]

Since the court did not have findings of fact to rely on and reviewed the case under the summary judgment standard, it stated the "question of whether Mr. Tobey's conduct was so 'bizarre' and 'disruptive' that Appellants' reaction was reasonable or whether Mr. Tobey was targeted because of the words on his chest cannot be decided at the 12(b)(6) stage." *Rendon* at 393. If, after discovery was completed, no genuine issue of material fact remained, a motion for summary judgment would then be appropriate. *Id.*

In Respondent's brief, he has recounted a hypothetical sequence of events as fact, whereas the actual decision clearly shows Mr. Tobey's version was significantly different. In his pleadings, Mr. Tobey claimed that before "proceeding through the AIT unit, [he] calmly placed his sweatpants and t-shirt on the conveyor belt, leaving him in running shorts and socks, revealing the text of the Fourth Amendment written on his chest. Agent Smith advised Mr. Tobey he need not remove his clothes. Mr. Tobey calmly responded that he wished to express his view that TSA's enhanced screening procedures were unconstitutional." *Tobey* at 384. Mr. Tobey

---

[4] The section in the majority opinion reads as follows:

> Whether Mr. Tobey was in fact "disruptive" is a disputed question of fact at this juncture. Appellants seem to think that removing clothing is *per se* disruptive. We beg to differ. Passengers routinely remove clothing at an airport screening station, and in fact are required to do so by TSA regulations. It is just as reasonable that Mr. Tobey calmly taking off his t-shirt and sweatpants caused no disruption at all, especially since he was never asked to put his clothes back on. And because we are reviewing the facts at the 12(b)(6) phase of litigation, we *must* view the facts in the light most favorable to Mr. Tobey. It could be perfectly true that after further factual development a court could find that Appellants acted reasonably given Mr. Tobey's conduct. Perhaps Mr. Tobey took off his shirt, twirled it around his head, and ripped off his pants with a dramatic flourish, indeed causing a great spectacle. However, we cannot, from this record at the 12(b)(6) stage, make this factual conclusion.

388-89.

asserted that at no point did he refuse to undergo the enhanced screening procedures nor did he

decline to do anything requested of him. In fact, Mr. Tobey alleges he "remained quiet,

composed, polite, cooperative and complied with the requests of agents and officers." *Id.* Here,

however, the record is clear that although Respondent was polite and courteous, he nevertheless

refused to cooperate with TSOs and refused directives from both TSA and police officers to put

his clothes back on.

### 5. Analysis

I fully concur with Respondent's assertion that citizens have a right to voice dissent from

government policies. I recognize that AIT screening, especially backscatter X-ray imaging, has

upset many people and generated both protests and lawsuits.[5] However, the Constitution protects

non-disruptive speech. The courts have recognized that airports are not public forums and speech

is subject to appropriate regulation in such environments. A recent case states that rather "than

the 'free expression of ideas,' the primary purpose of a screening checkpoint is the facilitation of

passenger safety on commercial airline flights, and the safety of buildings and the people for

whom a plane can become a dangerous weapons." *Mocek v. City of Albuquerque*, 2013 WL

312881 at *53. Speech in a screening checkpoint may be subject to reasonable restrictions.

Respondent's quiet recitation of what was occurring during the pat-down was non-

disruptive, did not interfere with the TSO's performance of his duties, and was therefore clearly

protected. His later actions in removing his clothing and refusing to put them back on when

directed to do so by screeners—thereby causing the line and entire checkpoint to be shut down—

interfered with TSO Nichols' and TSO Van Gordon's duty to conduct a thorough secondary

---

[5] *See, e.g., Redfern v. Napolitano*, 727 F.3d 77 (1st Cir. 2013); *Blitz v. Napolitano*, 700 F.3d 733 (4th Cir. 2012);
*Elec. Privacy Info. Ctr. v. Dept. of Homeland Sec.*, 653 F.3d 1 (D.C. Cir. 2011).

screening of Respondent and to do so in an efficient manner. The fact that Respondent was not loud or belligerent does not negate the fact that interference occurred.

Moreover, TSA is not charging Respondent with public nudity but with interference with the screening process. The governmental interest is limited to ensuring to the smooth and efficient functioning of the screening process, which is designed to prevent weapons or explosives that could result in harm to the passengers and aircraft from entering the sterile area. When Respondent deliberately removed his clothing and dropped them to the floor, he willfully frustrated this governmental interest. *See O'Brien*, 91 U.S. at 382 (1968). Interference with screening even as a protest is not protected speech; at best, Respondent's actions were a form of civil disobedience. While such acts may be valuable to bring attention to a cause, they do not protect participants from consequences of those acts, such as civil penalties.

### D. Conclusion

Having considered the record, I find TSA has established by a preponderance of the evidence that Respondent violated 49 C.F.R. § 1540.109 by interfering with screening personnel in the performance of their duties at Portland International Airport. Even if his actions constituted symbolic speech, those actions disrupted the screening process and were not protected speech under the circumstances. The other Constitutional claims discussed above are without merit. Accordingly the violation alleged is found PROVED.

## V. CONSIDERATION OF AN APPROPRIATE PENALTY

TSA has proved Respondent violated 49 C.F.R. § 1540.109, and is therefore entitled to a decision in its favor. TSA has proposed a civil penalty of $1,000.00. At the hearing, Respondent

presented mitigating evidence, arguing the requested amount is unwarranted in light of the facts of this case.

TSA maintains an Enforcement Sanction Guidance Policy on appropriate sanctions for civil penalty enforcement actions.[6] (TSA Ex D.) The purpose of this Policy is to provide TSA enforcement personnel with guidance in selecting appropriate penalties in civil penalty enforcement actions and to "promote consistency in enforcement of TSA regulations." (TSA Ex D at 1.) The Policy "does not restrict TSA from proposing higher penalties or penalties for violations not listed in the Sanction Guidance Table" and is meant "to assist, not replace, the exercise of judgment in determining the appropriate civil penalty in a particular case." *Id.*

Another element in determining an appropriate penalty is the "totality of the circumstances, including any aggravating and mitigating factors" present in each case. *Id.* Factors that may be considered are the significance or degree of security risk created by the violation; the nature of the violation (whether it was inadvertent, deliberate, or the result of gross negligence); past violation history, if any, which may necessitate an increased penalty; the violator's level of experience; the attitude of the violator, including the nature of any corrective action he or she has taken; the economic impact of the civil penalty on the violator; whether a criminal sanction has already been assessed for the same incident; whether the violator was disciplined by his or her employer for the same incident; and whether the violator engaged in artful concealment, fraud, and/or intentional falsification. *Id.*; *see also In re Paul Dunn*, 2009 WL 1638648 (D.O.T.) (TSA Appeal Decision 2009) (discussing enforcement guidance).

---

[6] This document is publicly available on TSA's website at http://www.tsa.gov/assets/pdf/enforcement_sanction_guidance_policy.pdf.

23

In the Enforcement Sanction Guidance Policy, TSA recommends a penalty of $500.00 - $1500.00 for cases of non-physical interference with screeners. (TSA Ex. D at 9.) The proposed penalty is in the mid-range for a violation involving interference with screeners.

TSA's rules of practice provide ALJs with the authority to assess a civil penalty. TSA's Complaint will set forth a proposed civil penalty amount, and the ALJ must issue an initial decision that includes the amount of any civil penalty found appropriate. However, the rules of practice do not require the ALJ to adopt the amount proposed by TSA in the Complaint. *See In re Hallahan*, 2010 WL 5018667 (Nov. 3, 2010) (affirming the ALJ's enhancement of the sanction beyond the amount requested by TSA, based on the particular facts and circumstances of the case).

### A. TSA's Argument concerning Sanction

TSA's Enforcement Sanction Guidance Policy gives a sanction range of $500.00 to $1500.00 for cases of non-physical interference. TSA considered as aggravating factors (1) that Respondent was an experienced flier and well aware of the screening process at Portland International Airport, (2) Respondent's lack of cooperation, (3) the deliberate nature of the violation, (4) his refusal to re-dress, and (5) the significance of the security risk. TSA considered the fact that Respondent had no prior violations as a mitigating factor. Based on the aggravating factors in this case, TSA believes that the sanction recommendation of $1000.00 is reasonable.

### B. Respondents Argument concerning Sanction

Respondent argues the proposed civil penalty amount sought by the TSA is unreasonable because the TSA fails to take into consideration existing mitigating factors, to wit: Respondent was non-violent, polite, non-abusive, and not profane or threatening. He stood quietly and

peacefully in exercise of his politically based opposition to TSA policies and procedures.
Respondent later faced State court criminal prosecution and was acquitted of criminal charges.
He also argues his actions were performed in a good faith belief that he was exercising his free
speech rights as an American citizen and a citizen of the State of Oregon; and he has suffered
financial and professional difficulties brought about when he was fired from his job as the result
of the incident giving rise to this case.

## C. Analysis

I will address each of the factors to be considered in assessing an appropriate civil
penalty as follows:

### 1. Significance or Degree of Security Risk Created by the Violation

The purpose of screening is establishing whether a passenger is carrying unlawfully a
dangerous weapon, explosive, or other destructive substance. There is no evidence in this record
that Respondent was carrying or attempting to introduce any prohibited item into the sterile area
or onto an aircraft. However, one of the purposes for the regulation in question is to protect
screeners from undue distractions. "Checkpoint disruptions potentially can be dangerous in these
situations. This rule supports screeners' efforts to be thorough and helps prevent individuals from
unduly interfering with the screening process." 67 Fed. Reg. 8340-01 (Feb. 22, 2002), *amended
by* 68 Fed. Reg. 49718-01 (Aug. 19, 2003).

Here, the effect of Respondent's actions was that an entire checkpoint was shut down.
While this shutdown was only for a few minutes, port police, airport operations personnel, and
TSA personnel deployed as a result of Respondent's actions. Accordingly, I find Respondent's
actions created a moderate security risk.

### 2. The Nature of the Violation

Respondent asserts he was both assisting TSA by removing his clothes and also doing it in protest. There is a fundamental inconsistency in these positions. However, Respondent testified he had checked whether Oregon law applied at the checkpoint and stated that his actions were legal under Oregon law. His preparations indicate this was a planned event. Even if he decided to strip only after the ETD indicated the presence of nitrates, it was still an intentional act. The act of dropping his clothes to the floor prevented the TSOs from conducting a required secondary screening for explosives.

Respondent made statements to TSOs and police that his actions were a protest. Based on Respondent's testimony and evidence, I find his violation was deliberate. Although Respondent considered it a protest, his actions did interfere with the screening process and he did not comply with subsequent directions from the TSOs.

### 3. Past Violation History

Respondent has no prior history of violations.

### 4. The Violator's Level of Experience

Respondent admits to being an experienced traveler who was generally familiar with airport screening procedures, including those at Portland International Airport.

### 5. The Attitude of the Violator

During the incident Respondent was non-violent, polite, non-abusive, not profane or threatening. However, he refused to follow the directions of TSA personnel.

6. *Whether a Criminal Sanction has Already Been Assessed for the Same Incident*

Respondent was charged with misdemeanor indecent exposure but acquitted. I note the elements of the criminal charge under Oregon law are significantly different than the elements of a violation of 49 C.F.R. § 1540.109. Respondent did not receive any criminal sanctions related to this incident.

7. *Whether the Violator was Disciplined by his or her Employer for the Same Incident*

This factor is significant to this case. Respondent testified he was fired by his employer as a result of this incident and, as of the date of the hearing, remained unemployed. TSA's proposed penalty did not take this fact into account.

8. *Whether the Violator Engaged in Artful Concealment, Fraud, and/or Intentional Falsification*

There is also no evidence Respondent engaged in artful concealment, fraud, or intentional falsification. Thus, none of these factors weighs into the determination of an appropriate sanction.

9. *The Economic Impact of the Civil Penalty on the Violator*

Financial hardship, when proven, may constitute grounds for reducing an otherwise appropriate civil penalty. The person who claims financial hardship bears the burden of proof and unsworn and unsubstantiated statements by an alleged violator are insufficient evidence of inability to pay. *See In re Donegan-Ortiz*, 2008 WL 2173909 (May 9, 2008). While Respondent testified that he has lost his job as a result of this incident, he has not introduced any testimonial or documentary evidence of financial hardship aside from his testimony that he had not yet secured a new job. Accordingly, I will not speculate on Respondent's financial condition as grounds for reducing a civil penalty.

27

### D. Conclusion

The sanction proposed by TSA of $1000.00 is in the mid-range of the Agency's guidelines for recommended penalties, however, TSA did not consider the fact Respondent was fired by his employer. I consider this a mitigating factor. However, Respondent did cause a major, albeit brief, disruption to general screening at the ABC checkpoint and a potential security risk. Although he held a good-faith belief that his actions constituted a form of protest, he nevertheless refused to comply with directions of TSA personnel and interfered with TSA personnel in the performance of their screening functions. Absent any mitigating factors, I might concur with the Agency, but in light of Respondent's job loss I consider a sanction at the lower end of the penalty scale to be adequate in this matter. Thus, I have determined that a civil penalty in the amount of $500.00 is appropriate.

### ORDER

**WHEREFORE:**

**IT IS HEREBY ORDERED**, after consideration of this record, that a violation of 49 C.F.R. § 1540.109 is found **PROVED** and a civil penalty in the amount of five hundred and dollars ($500.00) is **ASSESSED**.

**IT IS SO ORDERED.**

JORDAN.GEORGE. Digitally signed by JORDAN.GEORGE.J.1193117437
J.1193117437        DN: c=US, o=U.S. Government, ou=DoD, ou=PKI,
                    ou=USCG, cn=JORDAN.GEORGE.J.1193117437
                    Date: 2014.04.02 11:17:18 -07'00'

George J. Jordan
Administrative Law Judge

Done and dated April 2, 2014 at
Seattle, Washington.

# APPENDIX A: APPEAL RIGHTS

**49 C.F.R. § 1503.657 Appeal from initial decision.**

(a) *Notice of appeal.* Either party may appeal the initial decision, and any decision not previously appealed pursuant to § 1503.631, by filing a notice of appeal with the Enforcement Docket Clerk. A party must file the notice of appeal with USCG ALJ Docketing Center, ATTN: Enforcement Docket Clerk, 40 S. Gay Street, Room 412, Baltimore, Maryland 21202–4022. A party must file the notice of appeal not later than 10 days after entry of the oral initial decision on the record or service of the written initial decision on the parties and must serve a copy of the notice of appeal on each party. Upon filing of a notice of appeal, the effectiveness of the initial decision is stayed until a final decision and order of the TSA decision maker have been entered on the record.

(b) *Issues on appeal.* A party may appeal only the following issues:

> (1) Whether each finding of fact is supported by a preponderance of the evidence.

> (2) Whether each conclusion of law is made in accordance with applicable law, precedent, and public policy.

> (3) Whether the ALJ committed any prejudicial errors during the hearing that support the appeal.

(c) *Perfecting an appeal.* Unless otherwise agreed by the parties, a party must perfect an appeal, not later than 50 days after entry of the oral initial decision on the record or service of the written initial decision on the party, by filing an appeal brief with the Enforcement Docket Clerk.

> (1) Extension of time by agreement of the parties. The parties may agree to extend the time for perfecting the appeal with the consent of the TSA decision maker. If the TSA decision maker grants an extension of time to perfect the appeal, the Enforcement Docket Clerk will serve a letter confirming the extension of time on each party.

> (2) Written motion for extension. If the parties do not agree to an extension of time for perfecting an appeal, a party desiring an extension of time may file a written motion for an extension with the Enforcement Docket Clerk and must serve a copy of the motion on each party. The TSA decision maker may grant an extension if good cause for the extension is shown in the motion.

(d) *Appeal briefs.* A party must file the appeal brief with the Enforcement Docket Clerk and must serve a copy of the appeal brief on each party.

> (1) In the appeal brief, a party must set forth, in detail, the party's specific Transportation Security Administration, DHS § 1503.657 objections to the initial decision or rulings, the basis for the appeal, the reasons supporting the appeal, and the relief requested in the

appeal. If, for the appeal, the party relies on evidence contained in the record for the appeal, the party must specifically refer in the appeal brief to the pertinent evidence contained in the transcript.

(2) The TSA decision maker may dismiss an appeal, on the TSA decision maker's own initiative or upon motion of any other party, where a party has filed a notice of appeal but fails to perfect the appeal by timely filing an appeal brief.

(e) *Reply brief.* Unless otherwise agreed by the parties, any party may file a reply brief not later than 35 days after the appeal brief has been served on that party. The party filing the reply brief must serve a copy of the reply brief on each party. If the party relies on evidence contained in the record for the reply, the party must specifically refer to the pertinent evidence contained in the transcript in the reply brief.

(1) Extension of time by agreement of the parties. The parties may agree to extend the time for filing a reply brief with the consent of the TSA decision maker. If the TSA decision maker grants an extension of time to file the reply brief, the Enforcement Docket Clerk will serve a letter confirming the extension of time on each party.

(2) Written motion for extension. If the parties do not agree to an extension of time for filing a reply brief, a party desiring an extension of time may file a written motion for an extension and will serve a copy of the motion on each party. The TSA decision maker may grant an extension if good cause for the extension is shown in the motion.

(f) *Other briefs.* The TSA decision maker may allow any person to submit an amicus curiae brief in an appeal of an initial decision. A party may not file more than one appeal brief or reply brief. A party may petition the TSA decision maker, in writing, for leave to file an additional brief and must serve a copy of the petition on each party. The party may not file the additional brief with the petition. The TSA decision maker may grant leave to file an additional brief if the party demonstrates good cause for allowing additional argument on the appeal. The TSA decision maker will allow a reasonable time for the party to file the additional brief.

(g) *Number of copies.* A party must file the original appeal brief or the original reply brief, and two copies of the brief, with the Enforcement Docket Clerk.

(h) *Oral argument.* The TSA decision maker has sole discretion to permit oral argument on the appeal. On the TSA decision maker's own initiative or upon written motion by any party, the TSA decision maker may find that oral argument will contribute substantially to the development of the issues on appeal and may grant the parties an opportunity for oral argument.

(i) *Waiver of objections on appeal.* If a party fails to object to any alleged error regarding the proceedings in an appeal or a reply brief, the party waives any objection to the alleged error. The TSA decision maker is not required to consider any objection in an appeal brief or any argument in the reply brief if a party's objection is based on evidence contained in the record and the party does not specifically refer to the pertinent evidence from the record in the brief.

(j) *The TSA decision maker's decision on appeal*. The TSA decision maker will review the briefs on appeal and the oral argument, if any, to determine if the ALJ committed prejudicial error in the proceedings or that the initial decision should be affirmed, modified, or reversed. The TSA decision maker may affirm, modify, or reverse the initial decision, make any necessary findings, or may remand the case for any proceedings that the TSA decision maker determines may be necessary.

(1) The TSA decision maker may raise any issue, on the TSA decision maker's own initiative, that is required for proper disposition of the proceedings. The TSA decision maker will give the parties a reasonable opportunity to submit arguments on the new issues before making a decision on appeal. If an issue raised by the TSA decision maker requires the consideration of additional testimony or evidence, the TSA decision maker will remand the case to the ALJ for further proceedings and an initial decision related to that issue. If the TSA decision maker raises an issue that is solely an issue of law, or the issue was addressed at the hearing but was not raised by a party in the briefs on appeal, the TSA decision maker need not remand the case to the ALJ for further proceedings but has the discretion to do so.

(2) The TSA decision maker will issue the final decision and order of the Administrator on appeal in writing and will serve a copy of the decision and order on each party. Unless a petition for review is filed pursuant to § 1503.659, a final decision and order of the Administrator will be considered an order assessing civil penalty if the TSA decision maker finds that an alleged violation occurred and a civil penalty is warranted.

(3) A final decision and order of the Administrator after appeal is binding precedent in any other civil penalty action unless appealed and reversed by a court of competent jurisdiction.

(4) The TSA decision maker will determine whether the decision and order of the TSA decision maker, with the ALJ's initial decision or order attached, may be released to the public, either in whole or in redacted form. In making this determination, the TSA decision maker will consider whether disclosure of any of the information in the decision and order would be detrimental to transportation security, would not be in the public interest, or should not otherwise be required to be made available to the public.

**§ 1503.659 Petition to reconsider or modify a final decision and order of the TSA decision maker on appeal.**

(a) *General*. Any party may petition the TSA decision maker to reconsider or modify a final decision and order issued by the TSA decision maker on appeal from an initial decision. A party must file a petition to reconsider or modify not later than 30 days after service of the TSA decision maker's final decision and order on appeal and must serve a copy of the petition on each party. The TSA decision maker will not reconsider or modify an initial decision and order issued by an ALJ that has not been appealed by any party to the TSA decision maker and filed with the Enforcement Docket Clerk.

(b) *Form and number of copies*. A party must file in writing a petition to reconsider or modify. The party must file the original petition with the Enforcement Docket Clerk and must serve a copy of the petition on each party.

(c) *Contents*. A party must state briefly and specifically the alleged errors in the final decision and order on appeal, the relief sought by the party, and the grounds that support the petition to reconsider or modify.

> (1) If the petition is based, in whole or in part, on allegations regarding the consequences of the TSA decision maker's decision, the party must describe and support those allegations.
> (2) If the petition is based, in whole or in part, on new material not previously raised in the proceedings, the party must set forth the new material and include affidavits of prospective witnesses and authenticated documents that would be introduced in support of the new material. The party must explain, in detail, why the new material was not discovered through due diligence prior to the hearing.

(d) *Repetitious and frivolous petitions*. The TSA decision maker will not consider repetitious or frivolous petitions. The TSA decision maker may summarily dismiss repetitious or frivolous petitions to reconsider or modify.

(e) Reply petitions. Any other party may reply to a petition to reconsider or modify, not later than 30 days after service of the petition on that party, by filing a reply with the Enforcement Docket Clerk. A party must serve a copy of the reply on each party.

(f) *Effect of filing petition*. Unless otherwise ordered by the TSA decision maker, filing a petition pursuant to this section will stay the effective date of the TSA decision maker's final decision and order on appeal.

(g) *The TSA decision maker's decision on petition*. The TSA decision maker has sole discretion to grant or deny a petition to reconsider or modify. The TSA decision maker will grant or deny a petition to reconsider or modify within a reasonable time after receipt of the petition or receipt of the reply petition, if any. The TSA decision maker may affirm, modify, or reverse the final decision and order on appeal, or may remand the case for any proceedings that the TSA decision maker determines may be necessary.

## § 1503.661 Judicial review of a final order.

For violations of a TSA requirement, a party may petition for review of a final order of the Administrator only to the courts of appeals of the United States or the United States Court of Appeals for the District of Columbia pursuant to 49 U.S.C. 46110. A party seeking judicial review of a final order must file a petition for review not later than 60 days after the final order has been served on the party.

## APPENDIX B: WITNESSES AND EXHIBITS

**Witnesses:**

| | |
|---|---|
| Steve Van Gordon | For TSA |
| Jerry Nichols | For TSA |
| Jonathan David | For TSA |
| Brian Cotter | For TSA |
| Marsha Shanahan | For TSA |
| John Brennan | For Respondent |

**Exhibits:**

| | |
|---|---|
| TSA Ex. A | Video of the incident |
| TSA Ex. B | *In re Michael Rendon*, 2004 WL 2526015 (TSA Decision Maker 2004) |
| TSA Ex. C | 49 C.F.R § 1541.109 |
| TSA Ex. D | TSA Enforcement Sanction Guidance Policy |
| | |
| R Ex. 1 | Judgment of Acquittal, Circuit Court of the State of Oregon for Multnomah County |
| R Ex. 2 | Photograph of Respondent during the incident |
| R Ex. 3 | Charging document – Indecent Exposure |

v

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have transmitted the above document to the following persons, as indicated:

Susan Conn
Field Counsel – Seattle
Transportation Security Administration
By electronic mail to: susan.conn@tsa.dhs.gov

Robert A. Callahan
Northwest Law Center
Counsel for Respondent
By electronic mail to: racallahan@nwlawcenter.com

ALJ Docketing Center
By electronic mail to: aljdocketcenter@uscg.mil

Dated: April 2, 2014.

_____

Tobi C. Erskine
Paralegal Specialist to the Administrative
Law Judge

Before the
U.S. DEPARTMENT OF HOMELAND SECURITY
**TRANSPORTATION SECURITY ADMINISTRATION**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| John Brennan, | ) | Docket No. 12-TSA-0092 |
| | ) | |
| Respondent. | ) | |

### FINAL DECISION AND ORDER

Mr. John Brennan (Respondent) appeals the Initial Decision of the Administrative Law

Judge (ALJ) issued on April 2, 2014 holding that Respondent violated 49 C.F.R. §1540.109 and

assessing a civil penalty in the amount of $500.00.[1]  For the reasons set forth below, the appeal is

denied and the Initial Decision is upheld.

*Summary of Initial Decision.*  According to the findings of fact listed in the Initial

Decision, Respondent was a ticketed passenger on Alaska Airlines departing from Portland

International Airport on or about April 17, 2012.  At the security checkpoint, Respondent opted

to undergo a pat-down instead of Advanced Imaging Technology (AIT) screening.  Respondent

refused an opportunity to have the pat-down conducted in a private area.  A Transportation

Security Officer (TSO) conducted the pat-down and then conducted Explosive Trace Detection

(ETD) screening on the gloves he was wearing while performing the pat-down of Respondent.

The ETD is used to detect traces of explosives.  The ETD alarmed indicating the presence of

explosives.  The TSO notified a supervisory TSO (STSO) who informed Respondent additional

screening must be conducted to resolve the ETD alarm.  Respondent replied he would show the

STSO he was not hiding anything and removed all of this clothing and dropped them on the

floor.  Respondent testified that he disrobed to prove he was not carrying a bomb, although he

---

[1] §1540.109 states, "No person may interfere with, assault, threaten, or intimidate screening personnel in the performance of their screening duties under this subchapter."

later testified that his actions were a protest. It is TSA's policy not to touch bare skin during either a pat-down or ETD screening. TSA personnel directed Respondent to put his clothes back on at least three times and Respondent refused. TSA personnel notified the airport police. The STSO closed the entire checkpoint and directed TSOs to move bins in an attempt to block the public view of Respondent. The airport police arrived and twice requested Respondent to get dressed. Respondent refused. Respondent was arrested and removed from the checkpoint. Screening to resolve the ETD alarm was not conducted. The checkpoint was closed for approximately three minutes while Respondent was naked. A criminal charge of indecent exposure was brought against Respondent in Oregon state court and Respondent was found not guilty. Respondent was fired from his job as a result of the incident.

TSA filed a Complaint against Respondent alleging that he interfered with screening personnel in the performance of their duties in violation of 49 C.F.R. §1540.109 and assessed a civil penalty in the amount of $1,000.00.

The Initial Decision describes the positions of each party. First, Respondent claimed that the regulation is overbroad. The ALJ held that, pursuant to TSA's rules of practice at 49 C.F.R. §1503.607(b)(1)(v), he could not rule on Respondent's contention that the regulation was overbroad. However, he noted that the U.S. Court of Appeals for the Sixth Circuit found that the regulation was neither vague nor overbroad in its decision in Rendon v. TSA, 424 F.3rd 475 (6th Cir. 2005).

Second, Respondent contended his actions did not constitute interference under certain definitions of the term. TSA stated that the regulation was promulgated to address disruptive individuals at the checkpoint and was intended to prevent distractions which would inhibit a screener from effectively performing his duties. 67 Fed. Reg. 8340-01 (Feb. 22, 2002). TSA

2

argued that Respondent's actions created a distraction that prevented TSA from completing the screening of the Respondent and caused the entire checkpoint to be shut down to ensure that the screening of others was not impacted. The ALJ cites two decisions by the U.S. Court of Appeals for the Ninth Circuit to support his finding that, under the plain meaning of interference and the regulatory history explaining the intent of the regulation, Respondent's actions constituted interference. The ALJ also notes that in Rendon, the Court found that the regulation prohibits conduct that poses a hindrance to the accomplishment of a specified task. Rendon at 480. After considering the testimony presented by the TSOs, the plain meaning of the term interference, legal precedent, and the regulatory history of the regulation, the ALJ determined Respondent's actions in disrobing, dropping his clothes on the floor and refusing to comply with TSO directions constituted interference in that Respondent's conduct presented an actual hindrance to the TSOs' ability to conduct secondary screening and resolve the ETD alarm. He also found that the distraction created by Respondent required the STSO to close the checkpoint and divert other TSOs from their screening duties.

Third, Respondent claimed that the screening violated his Fourth amendment rights. The ALJ provided a detailed legal analysis to demonstrate that the airport search conducted by TSA, and the screening conducted in this case, is reasonable under the Fourth amendment.

Fourth, Respondent contended his conduct constituted political speech protected by the First amendment. While TSA asserted that constitutionality is beyond the scope of an administrative law hearing, the ALJ noted that he must consider whether Respondent's actions were protected speech in order to decide whether a violation occurred. The ALJ explained that the Court in Rendon found that the regulation did not infringe on the First amendment as the regulation serves a substantial government interest and "regulates speech only in the narrow

context of when that speech is reasonably found to have interfered with a screener in the performance of the screener's duties." Rendon at 480. Respondent relied upon a recent case decided in the U.S. Court of Appeals for the Fourth Circuit to support his First amendment claim. In that case, Tobey v. Jones, 706 F.3d 379 (4th Cir. 2013), the Court refused to dismiss a First amendment suit brought by Mr. Tobey who was arrested by airport police after he removed his shirt during screening to display the text of the Fourth amendment he had written on his chest. However, the ALJ explained that the case was not decided on its merits, but was an appeal of a denial of a motion to dismiss. In making its decision, the ALJ pointed out that the Court construed the facts in the light most favorable to the plaintiff and did not consider or make a finding on whether Mr. Tobey's actions in removing his shirt constituted interference with screening. The ALJ found that Respondent's reading of the case was inconsistent with the actual decision. The ALJ cited the U.S. Supreme Court decision in Int'l Soc. For Krishna Consciousness, Inc. v. Lee, 505 U.S. 672,679 (1992), which held that an airport terminal is a nonpublic forum and speech is subject to reasonable time, place, and manner restrictions, to support his decision. He also noted that another recent case, Mocek v. City of Albuquerque, 2013 WL 312881 (2013), held that speech in a screening checkpoint may be subject to reasonable restrictions because "the primary purpose of a screening checkpoint is the facilitation of passenger safety on commercial airline flights, and the safety of building and the people for whom a plane can become a dangerous weapon." Mocek at 53. The ALJ found that even if his action constituted protected speech, Respondent's actions disrupted screening and were not protected under those circumstances.

The ALJ concluded that in removing his clothing and refusing to put them back on when directed to do so, Respondent caused the line and the checkpoint to be shut down and interfered

with the TSOs' duty to conduct a thorough secondary screening of Respondent and to do so in an efficient manner. As a result, Respondent violated the regulation.

Finally, the ALJ lowered the amount of the civil penalty to $500.00 due to Respondent's job loss. Neither party addresses the amount of the civil penalty in their appeal documents.

*Respondent's Appeal.* In his appeal, Respondent contests the ALJ's determination that his actions interfered with the screening process. Respondent argues that his nudity made the TSA personnel uncomfortable, but did not interfere with the screening process. Respondent states that bare skin is not a hindrance to screening and actually reduces the effort needed to conduct screening. Respondent claims that once his clothes were dropped on the floor, they could have been inspected for explosives. Respondent explains that his nudity was not illegal and that the TSA personnel were more concerned about protecting the public from nudity than on completing screening.

In its reply brief, TSA points out that the findings of fact described in the Initial Decision were not contested by Respondent. TSA argues that Respondent's statements that bare skin facilitates screening are not supported by evidence in the record. TSA explains that the testimony of the TSOs demonstrated that they could not complete screening once Respondent removed his clothing and dropped them on the floor. TSA also contends that the conclusions of law were made in accordance with applicable law, precedent and public policy. TSA notes that the definition of screening was supported by relevant case law as well as the explanation of the regulation contained in the regulatory history. TSA argues that Respondent's statements regarding the legality of nudity in Oregon have no relevance, since Respondent was charged with interference with screening.

TSA's rules of practice in a civil penalty case state that a party may appeal an Initial Decision to the TSA Decision Maker. 49 C.F.R. §1503.657(a). However, a party may appeal only the following issues: 1) whether each finding of fact is supported by a preponderance of the evidence; 2) whether each conclusion of law is made in accordance with applicable law, precedent, and public policy; and 3) whether the ALJ committed any prejudicial errors during the hearing that support the appeal. 49 C.F.R. §1503.657(b).

After review of the record on appeal, I find that the findings of fact are supported by a preponderance of the evidence. Respondent proposes additional findings of fact in his appeal submission; however, none of these findings contradict or challenge the findings in the Initial Decision. In fact, in his submission Respondent says the finding that he "dropped his clothes on the floor is not a disputed fact." Respondent argues that the presence of bare skin is not a hindrance to screening and even reduces the burden of screening. That argument is not supported by the record. The testimony at the hearing revealed that TSA policy does not permit screening on bare skin. Based on the testimony of the TSOs, the ALJ found that disrobing and dropping his clothes on the floor presented such a distraction that the TSOs could not complete screening to resolve the ETD signal of explosives in an efficient manner.

In addition, there is nothing in the record to support Respondent's claim that the clothes he dropped on the floor were available for further screening. Respondent did not present his clothing for screening as accessible property. Respondent removed his clothing and dropped them on the floor after the ETD alarm and then refused to get dressed after repeated requests to do so by screening personnel and law enforcement officers. Such behavior is not indicative of cooperation or compliance with the screening process. In fact, the ALJ found that Respondent's "preparations indicate this was a planned event. Even if he decided to strip only after the ETD

6

indicated the presence of nitrates, it was still an intentional act." The ALJ concluded that the violation was deliberate and even if Respondent considered it to be a protest, the facts demonstrate that his actions interfered with the screening process. I concur with the ALJ's assessment.

Respondent also argues that TSA was concerned with his nudity, which he states is legal in Oregon, and not on carrying out its screening responsibilities. I agree with TSA that Respondent's arguments regarding the legality of the nudity are not relevant. As the ALJ points out, in Rendon, the Court found that loud, belligerent conduct interfered with the screening process. In that case, the conduct was legal, but the Court found that it was not protected speech and did in fact disrupt with the screening process.

Further, there is no evidence to support Respondent's contention that the reason the checkpoint was closed was to protect the public from his nudity. I agree with the ALJ's assessment of the record that Respondent's conduct created such a distraction that TSOs had to be diverted from their screening duties. In other words, TSOs were not able to conduct screening in an efficient manner on other passengers present at the checkpoint.

Respondent does not challenge the ALJ's analysis of case law or the regulatory history. I find that the Initial Decision is in accordance with applicable law, precedent, and public policy. Respondent does not present any issues evidencing that prejudicial errors were committed at the hearing to support his appeal.

Based on the foregoing, Respondent's appeal is denied and the Initial Decision is upheld. A party may petition the TSA Decision Maker to reconsider or modify a Final Decision and Order as described in 49 C.F.R. §1503.659 or make seek judicial review as stated in 49 C.F.R. §1503.661.

7

Dated: _September 18, 2014_

Melvin L. Carraway
Deputy Administrator

U.S. DEPARTMENT OF HOMELAND SECURITY
TRANSPORTATION SECURITY ADMINISTRATION
Washington, D.C.

In the Matter of: )
)
John Brennan, ) Docket No.
) 12-TSA-0092
Respondent. )

CERTIFICATE OF SERVICE

I hereby certify that the original and one copy of the attached Final Decision and Order of
the TSA Decision-Maker has been filed this 19th day of September, 2014, with the
Enforcement Docket Clerk:

ALJ Docketing Center, U.S. Coast Guard
U.S. Custom House, Room 412
40 South Gay Street
Baltimore, MD    21202-4022
ATTN: Enforcement Docket Clerk

I further certify that a copy of the attached Final Decision and Order of the TSA
Decision-Maker has been mailed, first-class postage prepaid, this 19th day of
September,. 2014, to the following:

Honorable George J. Jordan
Administrative Law Judge, U.S. Coast Guard
Henry M. Jackson Federal Building
915 Second Avenue, Room 2609
Seattle, WA  98174

Susan Conn, Esq.
Office of Field Counsel, TSA
18000 International Blvd., Suite 200
Seattle, WA    98118

John Edward Brennan
822 NE Hancock Street
Portland, OR  97212

DATED:  September 19, 2014

*Christine A Rosenquist*
CHRISTINE A. ROSENQUIST
Paralegal, for
Counsel to the TSA Decision-Maker
Transportation Security Administration

ER - 46



NAEGELI

DEPOSITION AND TRIAL EXPERTS

CORPORATE HEADQUARTERS
111 SW FIFTH AVENUE
SUITE 2020
PORTLAND, OR 97204
800.528.3335

THE NAEGELI ADVANTAGE

Naegeli

**UNITED STATES OF AMERICA**
**DEPARTMENT OF HOMELAND SECURITY**
**TRANSPORTATION SECURITY ADMINISTRATION**


IN THE MATTER OF:
JOHN EDWARD BRENNAN,

      Respondent.

      Docket No. 12-TSA-0092
_____


**TRANSCRIPT OF ADMINISTRATIVE HEARING**

**BEFORE THE HONORABLE**
**GEORGE J. JORDAN, ADMINISTRATIVE LAW JUDGE**


**TUESDAY, May 14, 2013**


**US BANKRUPTCY COURT**
**1001 SOUTHWEST FIFTH AVENUE, SUITE 700**
**PORTLAND, OREGON 97204**

```
 1                           INDEX

 2

 3   PROCEEDINGS                                    PAGE

 4

 5   Opening Instructions                            6

 6   Opening Statements - Complainant                8

 7   Respondent                                      9

 8

 9

10   COMPLAINANT WITNESSES:

11

12   Steve Van Gordon      Direct (Conn)            10

13                         Cross(Callahan)          37

14                         Redirect (Conn)          59

15                         Recross (Callahan)       62

16

17   Jerry Nichols         Direct (Conn)            64

18                         Cross (Callahan)         74

19

20   Jonathan David        Direct (Conn)            80

21                         Cross (Callahan)         99

22                         Redirect (Conn)         104

23

24   Brian Cotter          Direct (Conn)          108

25                         Cross (Callahan)       117
```




**NAEGELI**
DEPOSITION AND TRIAL EXPERTS

**800.528.3335**
NaegeliUSA.com

```
 1   Marsha Shanahan       Direct (Conn)           122

 2                         Cross (Callahan)        135

 3                         Redirect (Conn)         144

 4                         Recross (Callahan)      146

 5

 6

 7   Complainant Rests                             149

 8

 9

10

11   RESPONDENT'S WITNESSES

12

13   John Brennan          Direct (Callahan)       150

14                         Cross (Conn)            168

15

16

17   Respondent Rests                              172

18

19   Closing Arguments                             172

20

21

22

23

24

25
```

1                          INDEX OF EXHIBITS

2

3    COMPLAINANT'S EXHIBITS

4    No.       Description                Offered      Admitted

5

6    A         Video of Incident             89          150

7    B         Appeal of Michael Rendon     149          150

8    C         49 C.F.R 1541.109            150          150

9    D         Enforcement Sanction         134          150

10

11

12   RESPONDENT'S EXHIBITS

13

14   No.       Description                Offered      Admitted

15

16   1         Judgement Portland Court     167          167

17   2         Photograph of Mr. Brennan     54           55

18   3         Criminal Charging Document   166          166

19

20

21                 (EXHIBITS RETAINED BY COUNSEL)

22

23

24

25

NAEGELI  800.528.3335

DEPOSITION AND TRIAL EXPERTS        NaegeliUSA.com

1    Q.    Okay.  And can you describe, if you can

2  without using sensitive security information, what

3  the policy is regarding conducting the pat down.

4  How is that accomplished?

5    A.    The pat down is conducted when -- well,

6  for one thing if it's done in a limited way, if

7  someone is coming through the body scanners, the AIT

8  machines, you come through there.  If the machine

9  detects an anomaly, it shows up as a little yellow

10  square on the screen in the -- whatever area that

11  has alarmed.  You pat that particular area down to

12  check and see.  You ask the passenger, do you have

13  anything in a pocket or something like that.  And if

14  someone decides not to go that way and decides to go

15  -- to forego the scanner, then a full pat down is

16  required then, a full-body pat down as we call it.

17    Q.    Okay.  So let me stop you right there. So

18  passengers are given the option of not going through

19  what we call AIT or Advanced Imaging Technology?

20    A.    Yes.

21    Q.    And then we conduct -- you conduct what's

22  called a standard pat down?

23    A.    Yes.

24    Q.    And can you describe that procedure.

25    A.    The passenger is brought through another

1 | - and moving on down.

2 |     Q.    Okay.   Do you ever come to the front of

3 | them after --

4 |     A.    Yes.   After I've completed the back then I

5 | step around the front, tell them relax your arms,

6 | just -- just relax and then I clear the -- clear the

7 | front.   When I get down to the feet I check the --

8 | the feet and if they're -- if they're wearing socks,

9 | of course, if it's -- if they're not, then obviously

10 | I don't because we don't -- we don't examine bare

11 | skin.

12 |         So -- and at that point then I have to do

13 | a test on my gloved hands because I put gloves on.

14 | So I do a test and I tell them, I say, "This is a --

15 | this is in case my gloves have picked up anything

16 | during the pat down procedure."   So that's what I'm

17 | doing and then I tell them I'm going to put it in

18 | this machine over here and this machine looks for

19 | particles of explosive material.   That's what I tell

20 | every -- every person that I do a pat down on so I

21 | let them know here's what we're doing.   Here's

22 | what's going on and put it in there.

23 |     Q.   And you do that with every single

24 | passenger?

25 |     A.   Every one that I pat down.   Yes, ma'am.

1  I'm testing my gloves now in case, you know, the

2  gloves have picked up anything during the pat-down

3  procedure, and I, you know, just like usual and put

4  it in the machine for testing.

5      **Q.   And can you describe a little bit how that**

6  **works.  So you have a glove and then how do you**

7  **transfer it to something that's put in the machine?**

8      A.   There's a little swab that we have, a

9  little cloth swab so that as we -- as we go across

10 the glove we check various parts, both front and

11 back of the glove.  And then it's put into the -- on

12 both hands, and then it's put into the machine that

13 tests for particles of explosive material.

14     **Q.   Okay.  And is that the explosive trace**

15 **detection machine?**

16     A.   Yes.

17     **Q.   Otherwise known as ETD?**

18     A.   ETD, yes ma'am.

19     **Q.   So as result of the test of the gloves or**

20 **the swab of the gloves, what -- what occurred?**

21     A.   An alarm occurred indicating that there

22 was something on -- something had been detected on

23 the glove.  So the machine basically alarms, it

24 comes up red, and there's a alarm sound on the

25 machine.

NAEGELI

DEPOSITION AND TRIAL EXPERTS

800.528.3335

NaegeliUSA.com

Case: 14-73502, 03/02/2015, ID: 9441793, DktEntry: 13-2, Page 55 of 99

1    A.    No.

2    **Q.    And why not?**

3    A.    Because he had already been conducted a

4  pat down on there and none of the other procedures,

5  the additional procedures that he was -- that Mr.

6  Nichols informed him about would have required such.

7    **Q.    Okay.  In fact does removing the clothing**

8  **prevent you from conducting some screening?**

9    A.    Well, yes.

10    **Q.    And what -- what would that screening be?**

11    A.    Well, you can't -- you can't -- you don't,

12  you know, do any pat down of bare skin so you can't

13  conduct anything there.  The only other screening

14  that he would be -- that would have to be done would

15  be to clear the rest of his property because the of

16  the -- because of the alarm, the -- the next

17  procedures are to also clear the property.

18    **Q.    Okay.  And is there another explosive**

19  **trace detection test done as part of additional**

20  **screening?**

21    A.    Yes.

22    **Q.    And can that be done on bare skin?**

23    A.    No.

24    **Q.    Okay.  When Mr. Brennan was told to put**

25  **his clothes back on how did he respond?**

NAEGELI

DEPOSITION AND TRIAL EXPERTS

N

800.528.3335

NaegeliUSA.com

 1   screening on him while he was nude?

 2              MR. CALLAHAN:  Objection, leading, Your

 3   Honor.

 4              THE COURT:  Objection?

 5              MR. CALLAHAN:  Leading.

 6              THE COURT:  Rephrase.

 7              MS. CONN:  Okay.

 8   BY MS. CONN:

 9       Q.   Could you conduct the final screening on

10   Mr. Brennan?

11       A.   No.

12       Q.   Okay.  So he was never cleared by TSA,

13   correct?

14       A.   That is correct.

15       Q.   Okay.  So when the Port of Portland police

16   arrived did Mr. Brennan put his clothes back on?

17       A.   No.

18       Q.   Okay.  Do you recall what statements Mr.

19   Brennan made then?

20       A.   Yes.

21       Q.   What did he say?

22       A.   He -- when the Port police arrived he said

23   that this was a form of protest.  This was his

24   protest.

25       Q.   Okay.  Is Mr. Brennan in the courtroom

1  machine.  Yes.  You have to -- because now there's a

2  contaminant in the machine so you have to -- once

3  there is, then you have to clean it for the further

4  -- any further use.

5      Q.    Did you tell Mr. Brennan that explosives

6  had been detected?

7      A.    I did not.  It was Mr. Nichols who

8  informed him that it had alarmed for any nitrates.

9      Q.    Okay.  And in your training and

10 experience, nitrates are a component of explosives?

11     A.    Of explosives, yes, sir.

12     Q.    Did you ever tell Mr. Brennan that his --

13 his actions were disrupting your activities?

14     A.    No.

15     Q.    That they were disrupting other TSO or TSA

16 personnel activity?

17     A.    No.  Because it was -- there was nothing

18 that he did in that -- at that point while the pat-

19 down procedure was going on that would be

20 disruptive.

21     Q.    So I believe you said on this day at this

22 time you were operating as a dynamic officer?

23     A.    Yes, sir.

24     Q.    Being able to be moved wherever the need

25 was for you?

Case: 14-73502, 03/02/2015, ID: 9441793, DktEntry: 13-2, Page 58 of 99

1  would have done in screening Mr. Brennan after the

2  ETD alarm was set that you didn't do because of Mr.

3  Brennan's disrobing?

4      A.    You mean if Mr. Brennan had not disrobed?

5      Q.    Once the alarm went off --

6      A.    Yes.

7      Q.    -- and you called your supervisor --

8      A.    Yes.

9      Q.    -- is there anything else that you would

10 have done?

11     A.    Yes.   I would have accompanied Mr. Nichols

12 to the private screening area with Mr. Brennan and a

13 resolution pat down would have ensued.

14     Q.    Okay.

15     A.    Which the supervisor is in charge of at

16 that point.   I would have probably helped out in

17 looking through the property.

18     Q.    So -- so this pat down that you did with

19 the gloves was done in -- in public?

20     A.    Yes, sir.   Right -- right there.

21     Q.    Okay.   And --

22     A.    Right where Mr. Brennan is standing in

23 that photo.

24     Q.    In -- in this process when did Mr.

25 Brennan's screening end?



NAEGELI N 800.528.3335
DEPOSITION AND TRIAL EXPERTS   NaegeliUSA.com

1    A.   It technically was not finished as far as

2  we're concerned because there was an alarm that was

3  not resolved.  However, since the Port police came

4  down and took possession of his clothing and his

5  property, then it was basically turned over to -- to

6  them.  They, at that point, took over so and -- you

7  know, it depends on, you know, your point of view I

8  guess, from there they take over but technically he

9  had an alarm that was not resolved.

10    Q.   **Is there such a thing as a failure of a**

11  **screening?**

12    A.   Well, fail in the sense that you -- that

13  you get an alarm.

14    Q.   **But that can be resolved?**

15    A.   Yes.

16    Q.   **But in this case wasn't?**

17    A.   That's correct.

18    Q.   **Okay.  Could have Mr. Brennan not**

19  **consented to the pat down and you not heard that?**

20    A.   Many things are possible that you don't

21  hear.

22    Q.   **Okay.  You testified that in the pat down**

23  **if someone is not wearing socks --**

24    A.   Yes, sir.

25    Q.   **-- that you don't pat down the -- the**



1  skin?

2      A.    That is true.

3      Q.    **Why is that?**

4      A.    Because the -- it's uncovered and there's

5  no need -- you don't pat down bare skin on there.

6  It's basically, you know, you can see it.

7      Q.    **Because your pat down is focused on**

8  **explosives and weapons?**

9      A.    Yes, sir, any prohibited items. Uh-huh.

10     Q.    **So when Mr. Brennan disrobed --**

11     A.    Yes, sir.

12     Q.    **-- he was entirely bare skinned?**

13     A.    That is true.

14     Q.    **And to your visual inspection, he had no**

15  **explosives and no weapons?**

16     A.    That's true.

17          **MR. CALLAHAN:**  Nothing further, Your

18  Honor.

19          **THE COURT:**  Okay.  I just have one brief

20  question to clarify the record.  The multimedia

21  scanner, screening devices that are used in other

22  airports, the AIT in Portland is different?  That

23  does not have a secondary viewing section which has

24  to then notify the TSO to allow passengers to go

25  forward?

1        A.    No, sir.  He did not.

2        Q.    **Do you feel that he verbally abused you in**

3   **any way?**

4        A.    Me?  No, sir, huh-uh.

5        Q.    **Did he attempt to assault you?**

6        A.    No.  He did not.

7        Q.    **Did he ever threaten you?**

8        A.    He did not.

9        Q.    **Okay.  Did he ever attempt to prevent you**

10  **from doing any of your screening activity?**

11       A.    Well, other than stopping everything when

12  he took his clothes off, no, sir.

13       Q.    **Now, did he ever do that -- how -- was he**

14  **the -- how did he stop everything by taking his**

15  **clothes off?**

16       A.    Well, because that is a disruptive

17  activity.  So at that point, I call a supervisor

18  over and the supervisor comes over and, you know --

19       Q.    **So -- so it was someone else's action that**

20  **stopped the proceeding, not Mr. Brennan's conduct?**

21       A.    It was Mr. Brennan's action that caused

22  the stopping.  Yes, sir.

23       Q.    **Was he grumbling about the process?**

24       A.    I don't recall him grumbling about the

25  process.  He was -- as I stated he was pretty silent

1  on there, pretty much up -- up until we began the

2  pat down -- I began the pat-down procedure on him,

3  and at which time he began his -- what I call a

4  narration.

5       **Q.    Okay.  In fact, Mr. Brennan that day, in**

6  **your experience of him was rather polite through the**

7  **process, was he not?**

8       A.    Well, he was just not hostile.

9       **Q.    Okay.  And courteous to you?**

10      A.    Well, there was very little interaction

11 there so his courteousness would be, you know, you

12 can't be courteous if you're not really interacting

13 with someone.

14      **Q.    I want you to reflect on your conduct and**

15 **things that you remember doing yourself in answering**

16 **these questions.**

17      A.    Uh-huh.

18      **Q.    Did you ever tell Mr. Brennan that it was**

19 **necessary for him to put his clothes on to continue**

20 **the screening process?**

21      A.    I did not.

22      **Q.    Okay.  Did you ever tell him that his**

23 **activities were interfering with the performance of**

24 **your screening duties?**

25      A.    I did not tell him.



N A E G E L I
DEPOSITION AND TRIAL EXPERTS

800.528.3335
NaegeliUSA.com

1  then physically screened.

2      Q.    Okay.  And in Mr. Brennan's case was that

3  done?

4      A.    No.    Even though he was -- himself was

5  obviously there was nothing on his person, his

6  property had not yet been cleared because of the

7  alarm.

8      Q.    Okay.  And his clothing, is it possible

9  there was something on that?

10     A.    That's possible but we never further

11 examined the proper -- his clothing or his property

12 because the Port police showed up and took

13 possession of that.

14     Q.    Okay.  If someone -- if an alarm cannot be

15 resolved what happens?

16     A.    Well, now if he goes through and there --

17 you can't resolve and you're continuing to get an

18 alarm even after you continue to look into the

19 property and so forth, then you have issues as to

20 whether you can fly or not.

21     Q.    Okay.  So someone could be deprived of --

22 of getting on an aircraft?

23     A.    Potentially.

24     Q.    Okay.  And you mentioned that in that

25 picture you had your hand on the respondent's

Case: 14-73502, 03/02/2015, ID: 9441793, DktEntry: 13-2, Page 64 of 99

1  **property and you were watching it.  Why was that?**

2      A.    Because it has not been screen -- we have

3  an alarm now which requires property to be screened

4  and so I'm just basically there to make sure the

5  property is not interfered with until proper

6  screening can be done.

7      **Q.    Okay.  So the property couldn't be**

8  **released until further screening was accomplished?**

9      A.    That's correct.

10     **Q.    And that was not done in this case?**

11     A.    It was not.

12     **Q.    Mr. Callahan asked you about having people**

13 **divest some of their clothing for the screening**

14 **process and you mentioned jackets or coats and**

15 **scarves.  If you need someone to take off their**

16 **property do you instruct them to do so?**

17     A.    Yes.

18     **Q.    Okay.  And likewise, if someone took off**

19 **their property -- took off their clothing without**

20 **you ask -- asking them does that interfere with your**

21 **screening process?**

22     A.    If they took off --

23     **Q.    In Mr. Brennan's case he took off clothing**

24 **without being asked.**

25     A.    Yes.

1      Q.    Did it interfere with your screening

2 process of him?

3      A.    Well, I had already conducted a pat-down

4 procedure on him and we had got an alarm on him, you

5 know, somehow on -- on him so we had to continue

6 screening his -- his activity of taking his clothes

7 off then would constitute something that would stop

8 the process.  Yes.

9      Q.    So because he took his clothes off you

10 couldn't continue the screening process?

11      A.    No.  We were not going to do that.

12            MS. CONN:  Okay.  Thank you.  Nothing

13 further.

14            MR. CALLAHAN:  One quick question if I

15 could, Your Honor?

16            THE COURT:  Certainly.

17 RECROSS-EXAMINATION

18 BY MR. CALLAHAN:

19      Q.    TSO Van Gordon, after Mr. Brennan disrobed

20 which was after your full pat down --

21      A.    Yes, sir.

22      Q.    -- you could have further examined his

23 clothing, correct?

24      A.    Once the alarm had gone off and he was,

25 you know, informed, his clothing was basically right



NAEGELI    N    800.528.3335
DEPOSITION AND TRIAL EXPERTS         NaegeliUSA.com

1 | at his feet where he took -- where he just took and
2 | put them basically right at his feet.  Beings that
3 | the process had stopped at that point, no further
4 | screening is -- is being done because the Port
5 | police are en route, and once they arrived they took
6 | possession of it.
7 |     **Q.   But there was nothing that Mr. Brennan did**
8 | **that prohibited you from further examining his**
9 | **property?**
10 |     A.   That would not be a procedure there to --
11 | while he is in that state to continue the screening
12 | process.
13 |     **Q.   But there was nothing that he did like put**
14 | **his arm up or keep you away from his property?**
15 |     A.   Oh, no.  He didn't do anything to
16 | physically keep us there.  No, sir.  Other than
17 | undress.
18 |         **MR. CALLAHAN:**  Thank you, Your Honor.
19 |         **MS. CONN:**  Nothing further.
20 |         **THE COURT:**  Very good.  Okay.  You are
21 | excused subject to recall.  Please do not discuss
22 | your testimony with other parties.  Thank you.
23 |         **MS. CONN:**  TSA would call Jerry Nichols.
24 |         **THE COURT:**  Okay.  Witness is sworn. Your
25 | witness.



1  couldn't tell him that because once we called the

2  Port police they take over the -- the incident.

3       Q.    Okay.  And did he tell you that he was

4  engaged in a form of protest?

5       A.    No, sir.

6       Q.    He did not say that to you?

7       A.    No, sir.

8       Q.    And when you say that he refused your

9  request that he reclothe himself three times, how

10 did he refuse?

11      A.    He said, no, that he didn't have to.

12      Q.    Any explanation of that?

13      A.    He -- he said he didn't have to because he

14 had called the Port and they told him it wasn't

15 illegal.

16      Q.    Did you tell Mr. Brennan that his actions

17 had caused other TSO officers to be taken away from

18 their duties?

19      A.    No, sir.

20      Q.    What was the significance of young

21 children in the -- in the area to your decisions

22 about how you acted with Mr. Brennan?

23      A.    Because of the young children which we

24 brought bins over to have him hid -- kind of hidden

25 away from young children.

1    Q.    Does that have anything to do with

2 explosives or weapons?

3    A.    No, sir.

4    Q.    Isn't it a matter of state law?

5    A.    I can't answer that question.

6    Q.    What -- what TSA policy or procedure does

7 it offend?

8    A.    I can't answer that question.

9    Q.    At any time did Mr. Brennan interfere or

10 block your access to his property or clothing?

11    A.    No, sir.

12    Q.    Do you agree with TSO Van Gordon that as

13 part of a pat-down search or a follow-up pat-down

14 search that it doesn't involve touching bare skin?

15    A.    Yes, sir.

16    Q.    Would you say that within your personal

17 observation of Mr. Brennan on that day that you

18 could see all his bare skin?

19    A.    Once he removed his clothes, yes.

20    Q.    Okay.  And would you say that you could

21 safely conclude that he was not in possession of

22 explosives or weapons?

23    A.    On his person, yes.

24    Q.    Okay.  A pat-down search is necessarily

25 less revealing than the AIT detection, is it not?

ER - 67

1  doesn't happen every day and so my primary concern

2  was was this a diversion?  Was there more going on

3  than what it appeared because we didn't know.

4      **Q.   And by diversion what -- what possible**

5  **security threat do you -- are you thinking?**

6      A.   Well, if everyone is looking at the man

7  with no clothes, then the security -- the different

8  area, such as over by lane five, may be less and

9  someone may try to slip through or introduce a

10 prohibited item into the secure area.

11     **Q.   Okay.  When did you make the decision to**

12 **close the lanes?**

13     A.   When I saw Mr. Brennan standing there with

14 no clothes on.

15     **Q.   Okay.  After the notifications to the**

16 **police?**

17     A.   Yes.

18     **Q.   And to the coordination center?**

19     A.   Yes.

20     **Q.   Okay.  And -- and why did you believe the**

21 **lanes should be closed?**

22     A.   Because stop screening, contain and

23 control.  We have -- we want to stop the screening

24 process and try to contain what -- whatever is going

25 on, whatever it may be and control the access into

NAEGELI  N  800.528.3335
DEPOSITION AND TRIAL EXPERTS     NaegeliUSA.com

Case: 14-73502, 03/02/2015, ID: 9441793, DktEntry: 13-2, Page 70 of 99

 1 | the sterile area.

 2 |      **Q.    Because it may be a diversion?**

 3 |      A.    That's correct.

 4 |      **Q.    Okay.  And you have the ability to make**

 5 | **that call to close the lanes?**

 6 |      A.    Yes, I do.

 7 |      **Q.    And do you have -- you mentioned contain,**

 8 | **control.  Are those the criteria that you need to**

 9 | **consider when you make that decision?**

10 |      A.    Yes.

11 |      **Q.    And is that the TSA policy?**

12 |      A.    It is the TSA policy through our

13 | procedures to control the situation if there's a

14 | situation going on.

15 |      **Q.    Okay.  And that's done realtime as soon as**

16 | **you believe there's an incident unfolding?**

17 |      A.    Yes.  It's done immediately as soon as

18 | possible to -- once again, if it's a diversion, to

19 | stop the diversion from actually taking place if any

20 | -- any introduction of prohibited items into the

21 | sterile area.

22 |      **Q.    Okay.  Were you the person that decided to**

23 | **have the bins moved around Mr. Brennan?**

24 |      A.    Yes.  I pushed the first cart over there

25 | and asked them to put bins around there, around him.

Case: 14-73502, 03/02/2015, ID: 9441793, DktEntry: 13-2, Page 71 of 99

ER - 69

1      Q.    Going back to the lane closure, is that

2   something that's done often?

3      A.    No, it's not done often.

4      Q.    Okay.  It -- can you give us an idea in

5   general how often you may close the lanes?

6      A.    In a security incident, maybe once or

7   twice a month, if that, maybe less.

8      Q.    Okay.  And in this area when you decided

9   to close the lanes, were all the lanes closed that

10  were being used at the ABC checkpoint?

11     A.    Yes.

12     Q.    So all those passengers that were trying

13  to get on flights were unable to come through

14  screening?

15     A.    That is correct.

16     Q.    Okay.  And do you know how -- how long the

17  lanes were closed approximately?

18     A.    A little bit over three minutes total.

19     Q.    Okay.  Now, that seems like a pretty short

20  time to me.  Is that -- is that a big deal, only

21  three minutes?

22     A.    Well, it's perspective.  It's -- for us,

23  yes, it's a big deal.  For the passengers it's all

24  up to them.

25     Q.    Somebody's running late for a flight it



NAEGELI
DEPOSITION AND TRIAL EXPERTS

800.528.3335
NaegeliUSA.com

1  could mean the difference between making it and not?

2          **MR. CALLAHAN:**  Objection, speculation,

3  Your Honor.

4          **THE COURT:**  Sustained.

5  **BY MS. CONN:**

6      **Q.   You decided to open lane five prior to the**

7  **other two.  Why -- why was that?**

8      A.   Because it appeared there were no children

9  in that area and it was furthest away from the --

10  the possible diversion.

11     **Q.   Okay.  And the decision to move the bins**

12  **around is that -- is there any policy on that?**

13     A.   No.  That was a decision I made because

14  that was what we had at hand.

15     **Q.   And why did you feel the necessity to move**

16  **the bins around to shield the respondent?**

17     A.   To cover him up because I didn't know

18  whether there were children around and we don't want

19  -- I mean, I didn't want the children to see this.

20     **Q.   Is that a policy decision or your**

21  **decision?**

22     A.   That was my decision.

23     **Q.   Can you give me an estimate, if you can,**

24  **about how many passengers were possibly affected by**

25  **the lane closure?**

Case: 14-73502, 03/02/2015, ID: 9441793, DktEntry: 13-2, Page 73 of 99

1      Q.    Almost 11 years.  You have, like TSO

2  Nichols, performed almost every duty and function in

3  the screening line; is that correct?

4      A.    Well, as a supervisory officer, yes.

5      Q.    Okay.  Have you conducted pat-down

6  searches?

7      A.    Yes.

8      Q.    Have you conducted resolution pat-down

9  searches after an alarm?

10      A.    Yes.

11      Q.    Okay.  For a pat-down search, do you offer

12  the passenger presenting themself to screening an

13  opportunity for a private pat down?

14      A.    Yes.

15      Q.    Where is that conducted?

16      A.    In the private screening room.

17      Q.    Where is that private screening room?

18      A.    On the video you could see Mr. Frasier,

19  the security manager, went into it private screening

20  room.

21      Q.    Could you estimate in terms of feet how

22  far away from Mr. Brennan that was?

23      A.    75 feet, 50 feet, somewhere in there.

24      Q.    Rather than shutting down the screening

25  lines, could Mr. Brennan have been asked to move to

Case: 14-73502, 03/02/2015, ID: 9441793, DktEntry: 13-2, Page 74 of 99

1   a private screening area?

2        A.   Mr. Brennan --

3             MS. CONN:   Objection.   Sorry.   It calls

4   for speculation.

5             THE COURT:   Try to rephrase.

6   BY MR. CALLAHAN:

7        Q.   Was it an option of TSO Nichols to ask Mr.

8   Brennan to move to the private screening area?

9        A.   I was not there when Mr. Nichols talked

10  with Mr. Brennan.

11       Q.   I understand that.   Was it an option for

12  TSO Nichols to move Mr. Brennan to the private

13  screening area?

14       A.   In the advisements that he would have

15  given him in the private screening room, he would

16  have advised him before and after if he wanted a

17  private screening.

18       Q.   Okay.   Was it an option for TSO Nichols to

19  move Mr. Brennan to a private screening area?

20       A.   Yes.

21       Q.   Okay.   And that would have foregone the

22  necessity of closing down the screening lines, would

23  it not?

24       A.   Possibly.

25       Q.   Okay.   And it would have foregone your

1        Q.    Okay.  Isn't that a matter for state law?

2        A.    I can't speak to that.  I don't know.

3        Q.    Okay.  Is the purpose of screening by the

4   TSA at Portland Airport ABC screening area focused

5   on explosives and weapons?

6        A.    Yes.

7        Q.    At the beginning in the video where Mr.

8   Brennan disrobed, there is a period of time where he

9   was standing disrobed and passengers continued to be

10  processed through the screening in line five,

11  correct?

12       A.    Yes.

13       Q.    And they continued up until the time that

14  you ordered that lane shut down, correct?

15       A.    Correct.

16       Q.    Okay.  You expressed a concern that Mr.

17  Brennan's disrobing activities may have been a

18  diversion and that in your training you were aware

19  of the rest of the screening area to make sure there

20  wasn't a breach into the sterile area, correct?

21       A.    Yes.

22       Q.    Was there, in fact, any other activity

23  going on when Mr. Brennan was disrobed?

24       A.    For part of the time he was disrobed, yes.

25       Q.    Was -- was there any breach -- other

1  there you basically transferred your concern to Mr.

2  Brennan to them; is that correct?

3       A.   Yes.

4       Q.   And then you could resume your attention

5  to the checkpoint; is that correct?

6       A.   Yes.

7       Q.   Okay.  Do you believe it's appropriate to

8  offer private screening to a person that is totally

9  naked?

10      A.   Yes.  Because part of our procedure is to

11  do the private screening for that enhanced

12  screening.

13      Q.   But as Mr. Brennan is totally naked

14  standing in the checkpoint, would you feel

15  comfortable as a manager asking your people to take

16  him to a private room?

17      A.   No.

18      Q.   Would you order your people to take him to

19  private screening?

20      A.   No.

21      Q.   And, in fact, did you order anybody to

22  offer him private screening on that day?

23      A.   I did not.

24      Q.   Did anyone offer or order TSOs to take Mr.

25  Brennan for private screening?

NAEGELI
DEPOSITION AND TRIAL EXPERTS

N

800.528.3335
NaegeliUSA.com

1       A.    No one ordered him, no.

2       Q.    Mr. Callahan asked you about closing the

3  checkpoint, that we could see people coming through.

4  Were those people possibly people that were already

5  within the checkpoint when it was closed --

6       A.    Yes.

7       Q.    -- and were continuing through?

8       A.    Yes.

9       Q.    And then as it turned out, there was no

10  one else working in concert or creating a diversion

11  with Mr. Brennan on that day to your knowledge; is

12  that correct?

13       A.    That's correct, to our knowledge.

14       Q.    Okay.  But at that time when you made the

15  decision to close down the lanes, did you know that?

16       A.    No.

17       Q.    We didn't really see from the video but

18  can you describe what other passengers were doing in

19  the area.  I didn't really see much from the video.

20            MR. CALLAHAN:  Outside the scope, Your

21  Honor.

22            MS. CONN:  It's part of the video.

23            THE COURT:  Again, this is redirect so

24  it's adding -- we -- again, I can have somewhat --

25  what's the nature of this question and we'll discuss

 1      Q.   And what was Mr. Brennan's reaction to

 2  learning that you were charging him with disorderly

 3  conduct?

 4      A.   He told me if he had realized -- if I had

 5  told him that prior to arresting him that he would

 6  have put his clothes on.

 7      Q.   Okay.  When you asked him -- did you ask

 8  him why we he removed his clothing at the

 9  checkpoint?

10      A.   Yes.

11      Q.   And what was his response to you?

12      A.   He told me it was a -- it was his right to

13  -- he was protesting.  And I have a quote, it's, "I

14  just did it as a form of protest which is my right."

15      Q.   Okay.  Did Mr. Brennan ever say anything

16  to you about TSA or his concern about TSA?

17      A.   The only comment I have in my report is

18  that he was tired of being hassled.

19      Q.   Being hassled?

20      A.   Yes.

21      Q.   Okay.

22          MS. CONN:  Thank you.  I have nothing

23  further.

24          THE COURT:  Your witness.

25          MR. CALLAHAN:  Thank you, Your Honor.

1  year after the fact in your police report in

2  quotation marks, you're fairly confident that that's

3  what was actually said?

4      A.   Yes.

5      Q.   Okay.  Throughout your interaction with

6  Mr. Brennan that day at the ABC screening point at

7  the Portland International Airport, did he -- was he

8  belligerent or unruly?

9      A.   No.

10     Q.   Did he ever try to assault you or was he

11 physical in any way?

12     A.   No.

13     Q.   Was he -- did he use profanities?  Was he

14 angry?

15     A.   No.

16     Q.   Okay.  Is it fair to say that he was

17 polite?

18     A.   That would be fair.

19     Q.   Courteous?

20     A.   That would be fair.

21     Q.   Okay.  At any time did you tell Mr.

22 Brennan that his act of disrobing and being naked in

23 public was against the law?

24     A.   Yes.

25     Q.   Okay.  And when you said that, what law

Case: 14-73502, 03/02/2015, ID: 9441793, DktEntry: 13-2, Page 80 of 99

1      A.    No.   It's not uncommon.

2      Q.    **And were you called to testify at the**

3  **state criminal prosecution against Mr. Brennan?**

4      A.    Yes.

5      Q.    **Okay.  And did you so testify?**

6      A.    I did.

7      Q.    **Okay.  And are you aware of the outcome of**

8  **that trial?**

9      A.    Yes.

10     Q.    **Okay.  And so Mr. Brennan was correct, was**

11 **he not, that it was not against state law for him to**

12 **be naked?**

13     A.    Well, it wasn't against the city

14 ordinance.

15     Q.    **City code.**

16     A.    Correct.

17     Q.    **So he was acquitted --**

18     A.    He was.

19     Q.    **-- of criminal charges?**

20     A.    Yes.

21     Q.    **Okay.  So is it fair to say that his**

22 **evaluation of his protest was correct under an**

23 **analysis of the Portland City code?  Based on the**

24 **outcome of the criminal trial?**

25     A.    Based on the decision of the judge, yes.

NAEGELI

DEPOSITION AND TRIAL EXPERTS

N

800.528.3335

NaegeliUSA.com

Case: 14-73502, 03/02/2015, ID: 9441793, DktEntry: 13-2, Page 81 of 99

1      Q.    You know why we're here today, don't you?

2      A.    I do.

3      Q.    Okay.  It's been a long road.  You've been

4   deposed and now you're here because you feel that

5   the attempt by the TSA to impose a sanction against

6   you is inappropriate, correct?

7      A.    Yes.

8      Q.    Okay.  Could you tell the Court a little

9   bit about yourself, how old you are.

10     A.    I'm 50 years old.

11     Q.    Where did you live?

12     A.    I live here in Portland.

13     Q.    What's your education?

14     A.    I have a bachelor's in fine art and a

15  master's in urban planning.

16     Q.    What do you do for a career?

17     A.    Up until the time pf my protest, I helped

18  manage enterprise level websites.

19     Q.    And then after that point in time, what

20  happened?

21     A.    I was fired for my protest.

22     Q.    Okay.  And so as a result of your conduct

23  at PDX, the subject of this hearing, you lost your

24  job?

25     A.    I did.

Case: 14-73502, 03/02/2015, ID: 9441793, DktEntry: 13-2, Page 82 of 99

1      Q.   Okay.  Up until that time and afterwards

2  would you consider yourself a frequent flyer?

3      A.   I would.

4      Q.   Okay.  Are you familiar generally with the

5  conditions that are put upon the traveling public to

6  take advantage of air travel in this country?

7      A.   Yes.

8      Q.   Okay.

9      A.   I'm familiar with it both before September

10  11th and after September 11th.

11      Q.   Are you generally familiar with the TSA

12  screening processes at Portland International

13  Airport?

14      A.   Yes.

15      Q.   Okay.  Did you ever contact anyone

16  affiliated with the Portland Airport?

17      A.   I did.

18      Q.   Okay.  Prior to the incident on April

19  17th, 2012, regarding conduct of -- of the public at

20  the airport?

21      A.   Yes, I did.

22      Q.   And can you tell us about that contact.

23      A.   I was curious as to the jurisdiction of

24  the airport.  So I called the Port of Portland and

25  spoke to someone who told me actually the rules of



Case: 14-73502, 03/02/2015, ID: 9441793, DktEntry: 13-2, Page 83 of 99

1     Q.    Sweater?

2     A.    Yes.

3     Q.    Okay.  So you're familiar with taking off

4  your clothing at the airport with no adverse

5  reaction at all?

6     A.    Correct.

7     Q.    Okay.  On -- on the day of this incident,

8  April 17th, 2012, were you told by any TSA official

9  to take off any article of clothing?

10     A.    Yes.

11     Q.    Okay.  Can you tell us briefly what

12  happened.  We've been told already that it was

13  around 5:30ish in the afternoon.  You were heading

14  on a flight somewhere.  Can you just bring us up to

15  speed on that.

16     A.    Sure.  I went through what started to be a

17  normal screening.  I had my shoes off, my belt off,

18  my sweater and jacket.  I think I had my glasses off

19  too, although I don't recall.  And as is my standard

20  practice I opted out.

21     Q.    Well, let's -- let's back up then.

22     A.    Okay.

23     Q.    Was there any declaration to you either in

24  writing or by a TSA official about your option to

25  opt out?

NAEGELI        N   800.528.3335
DEPOSITION AND TRIAL EXPERTS       NaegeliUSA.com

1    A.   Actually, that day I happened to notice a

2  little placard in the endless rope and where you go

3  back and forth, back and forth, that it in fact was

4  optional.  And it's the first time I'd seen it but

5  it was already knowledge to me.

6    **Q.   Okay.**

7    A.   I was already aware of it.

8    **Q.   So what were we opting out of?**

9    A.   I just think of it as the newer

10 technology.  Non-metal detectors.

11   **Q.   So you partially disrobed and put those**

12 **items along with any other personal items you were**

13 **carrying into, for lack of the better word, the tub?**

14   A.   Yeah.

15   **Q.   And -- and that goes through some sort of**

16 **x-ray machine or something?**

17   A.   Yes.

18   **Q.   Okay.  And then you now were confronted**

19 **with something that allowed you to opt out and you**

20 **did that.  How -- how did you -- how did you express**

21 **your desire to opt out?**

22   A.   I waited until a TSA officer addressed me

23 and he indicated -- I don't even remember the gender

24 of the officer -- indicated that I should proceed

25 through the new technology and I announced that I

NAEGELI   N   800.528.3335
DEPOSITION AND TRIAL EXPERTS        NaegeliUSA.com

1 was opting out.

2      Q.   Okay.  And did you realize that by so

3 opting that you were committing yourself to a full

4 pat-down search?

5      A.   Yes.

6      Q.   Okay.  And -- and that was your choice?

7      A.   Choice makes it a difficult word.  I

8 choose to fly and it's the price I have to pay for

9 flying.

10      Q.   Okay.  If -- if you had in your universe

11 of choices the option not to have a pat-down search,

12 you would have chosen that one?

13      A.   Yes, I would have.

14      Q.   Okay.  But given the fact that you wanted

15 to fly that day and given the very narrow range of

16 options that you had, you chose this one?

17      A.   Yes.

18      Q.   Okay.  And you knew that it would include

19 a somewhat uncomfortable physical examination of

20 your groin and buttocks?

21      A.   That was less concerning of me than the

22 violation of my privacy as a -- as a -- I don't want

23 to say concept but the intrusiveness of the

24 inspection given my risk.

25      Q.   And were you given an option to have this

1  **pat-down search done in a private screening area?**

2      A.    I was.

3      **Q.    Okay.  And did you exercise that option?**

4      A.    I did not.  I declined.

5      **Q.    And why did you so decline?**

6      A.    I -- I feel that everything that the TSA

7  does should be in the visibility of the public.  I

8  didn't feel that I need -- because the TSA was

9  violating my privacy, I didn't feel like I needed

10  privacy from anything else.

11      **Q.    We've heard testimony so far about the**

12  **fact that the TSA agent's gloves when tested set off**

13  **an alarm.  Do you agree with the testimony that's --**

14  **that occurred so far on that point?**

15      A.    I never heard the alarm.  I just had

16  verbal reports that that's what happened.

17      **Q.    Okay.  There were some comments about**

18  **whether or not you stated personally whether you did**

19  **not consent to the search.**

20      A.    Yes.

21      **Q.    Did you say something like that?**

22      A.    I did.  And I was aware that it wasn't

23  heard.  I stated that before.  I've gone through it

24  with officers and end up getting searched so that I

25  can get on the plane.

NAEGELI   N   800.528.3335
DEPOSITION AND TRIAL EXPERTS       NaegeliUSA.com

ER - 85

1      **Q.    Were you angry?**

2      A.    I wasn't angry.

3      **Q.    Were you belligerent?**

4      A.    I was not.

5      **Q.    Were you abusive to any TSA officer?**

6      A.    No.

7      **Q.    Did you use profanity?**

8      A.    I did not.

9      **Q.    Did you use vulgarity?**

10     A.    No.

11     **Q.    Did you try to assault any TSA folk,**

12 **personnel?**

13     A.    No.

14     **Q.    There was some testimony that during the**

15 **full pat down that you narrated the activity.  Could**

16 **you explain for the Court what exactly happened**

17 **there.**

18     A.    Sure.  I describe what happens to me

19 through every pat down because I believe that I'm

20 able to.  That there's no restriction for me

21 speaking.

22     **Q.    So this wasn't the first time that you did**

23 **this?**

24     A.    I do it every pat down -- every pat down.

25 It provides a degree of comfort for me.  It also

NAEGELI
DEPOSITION AND TRIAL EXPERTS

N

800.528.3335
NaegeliUSA.com

1  puts the pat down into a routine.  For instance, it

2  helps me notice when the routines aren't consistent,

3  that sometimes some officers do certain parts and

4  other times other officers do different parts and --

5     **Q.   This is for your own benefit?**

6     A.   Yes.  It's entirely for my own benefit.

7  It's comforting to me.

8     **Q.   Okay.  And -- and so can you take us**

9  **through the next couple of minutes and what I want**

10 **you to do is try to be as clear as you can about the**

11 **sequence of what happened.  Okay.  We -- we have you**

12 **opting out; having the full pat-down search; having**

13 **the gloves swabbed and setting off an alarm.  Now,**

14 **will you take it and tell us what happened after**

15 **that.**

16    A.   It was a long time before I knew what was

17 going on.  And I think it's pretty evident in the

18 video that TSA is doing a bunch and I'm just

19 standing there.  I wasn't -- and I want to say that

20 I was informed that I was being tested for

21 explosives.  Which I think contradicts some of the

22 earlier testimony.  I --

23    **Q.   No.  No.  Let me stop you.  In fact, you**

24 **were told that you were being tested for or that you**

25 **had set off an alarm for?**

1       A.    The former.  I --

2       **Q.    Okay.**

3       A.    As I was doing my narration as the TSO

4  headed toward a machine and I said, "And I'm being

5  tested for," and he answered, "Explosives."

6       **Q.    Okay.  So let -- let me stop you for a**

7  **moment and I'm going to come back to this point and**

8  **ask you to go forward.  Had you been around any**

9  **explosives that day?**

10      A.    Not to my knowledge.

11      **Q.    Had you been in possession of any handguns**

12 **or -- or rifles or any sort of ammunition or**

13 **anything like that?**

14      A.    No.

15      **Q.    Was there any reason in your mind that you**

16 **should have tested positive for nitrates at the TSA**

17 **checkpoint?**

18      A.    I'm not aware other than that nitrates are

19 a very common substance.

20      **Q.    Okay.  Could you take us forward from**

21 **there.**

22      A.    Sure.  So I didn't hear an alarm.  I

23 understand it makes noise whether it's positive or

24 negative in the results.  And at this point I knew

25 that there started to be -- I noticed that there

Case: 14-73502, 03/02/2015, ID: 9441793, DktEntry: 13-2, Page 90 of 99

 1 circumstance and my -- I asked my TSO what was going

 2 on and he said, "You tested for positive."  And I

 3 said, "For what?"  And he said, "I can't tell you

 4 but my supervisor can."  And I said, "Where is your

 5 supervisor?"  And he indicated someone walking

 6 toward me.  As that --

 7     **Q.   So -- so based on the witnesses that**

 8 **you've seen today are we talking about TSO Van**

 9 **Gordon and Nichols?**

10     A.   Yes.  As Van Gordon got close to me but

11 within I would say sort of -- I normally wouldn't

12 talk to someone who was that far away but as he was

13 approaching me and my uncomfortableness was growing

14 and my concern was growing, you know, and the

15 distance was decreasing, I said, "What did I test

16 positive for," and he said, "Nitrates."  I don't

17 recall him saying anything to me.  He was still --

18     **Q.   Does the fact that -- did you -- do you in**

19 **your own mind equate nitrates with explosives?**

20     A.   Yes.

21     **Q.   Okay.**

22     A.   I -- I very quickly went to nitrates.  They

23 used those in Oklahoma City.  They think I'm

24 carrying a bomb.

25     **Q.   Okay.**

NAEGELI

DEPOSITION AND TRIAL EXPERTS

N

800.528.3335

NaegeliUSA.com

1    A.   And that was enough information.  Given

2  that my screening was already delayed, given that I

3  was very aware that this wasn't going -- given that

4  I was being -- I had a lot of TSA people around me,

5  that both to point out the, frankly, absurdity of

6  the accusation and to prove my innocence that I

7  wasn't carrying explosives and, frankly, my non-

8  bashfulness and my knowledge of Oregon law, that the

9  quickest way to prove the accusations against me,

10  were to remove my clothes, to disrobe.

11    **Q.   So in a sense you were motivated by the**

12  **desire to assist clarifying the fact that you did**

13  **not have explosives or weapons on you?**

14    A.   Yes.  I was interested in getting to the

15  gate and getting back to work and it seemed the most

16  expedient way to get through what I was facing.

17    **Q.   And at that point did you consider that**

18  **you were in any way interfering with the TSO or the**

19  **TSA operations?**

20    A.   No.

21    **Q.   Did you feel that you were interfering**

22  **with the screening process that was going on at the**

23  **rest of the ABC checkpoint?**

24    A.   No.

25    **Q.   Did you feel that you were causing any TSA**

Case: 14-73502, 03/02/2015, ID: 9441793, DktEntry: 13-2, Page 92 of 99

 1  officer to be less efficient in the performance of

 2  their duty?

 3      A.   No.

 4      Q.   What makes -- what made you feel that

 5  disrobing at that point in time was appropriate?

 6      A.   Again being expeditious, just getting my

 7  screening over with.  And knowing that it was within

 8  my legal right to protest the treatment.

 9      Q.   And so there was this element of protest

10  in your act of disrobing?

11      A.   Yes.

12      Q.   Okay.  There was a comment, and forgive

13  me, I can't remember which witness said it earlier

14  today that you may have said a statement something

15  like, you were tired of being hassled?

16      A.   Yes.

17      Q.   Could you explain that to the Court,

18  please.

19      A.   Sure.  You know, especially in those

20  circumstances I was using hassled as sort of a

21  catch-all phrase.  I repeatedly feel -- every time I

22  go through security I feel like my constitutional

23  rights are being violated.  I feel that the

24  inflexibility in the system is difficult.  I feel

25  that the assumption of guilt until proven innocent

1  by going through screening is inappropriate and a

2  huge waste of my tax dollars.  And so when I say

3  "hassled," it was shorthand for a lot of complex

4  feelings that I've had for a long time.

5      **Q.    What constitutional rights did you feel**

6  **were being offended?**

7      A.    In a regular screening, my right to

8  privacy including the right to privacy from TSOs and

9  inappropriate search.

10     **Q.    Okay.  Do you feel -- at any point in time**

11 **were you told by any Transportation Security**

12 **Administration official that you were breaking the**

13 **law?**

14     A.    No.

15     **Q.    Okay.  Were you ever told by anyone that**

16 **you were interfering with the screening process?**

17     A.    No.

18     **Q.    Were you ever told that you were causing**

19 **them to be less efficient in the performance of**

20 **their duties?**

21     A.    No.

22     **Q.    Were criminal charges brought against you**

23 **in State court in Oregon as a result of this action?**

24     A.    Yes, they were.

25     **Q.    Okay.  And what were you charged with?**



1          **MR. CALLAHAN:**  Thank you.

2   **BY MR. CALLAHAN:**

3      **Q.    I'm handing you what's been marked**

4   **Respondent's Exhibit 1, and ask if you recognize**

5   **that?**

6      A.   Yes.

7      **Q.    And could you tell the Court what it is.**

8      A.   It is a judgment that I was found not

9   guilty.

10     **Q.    Okay.  And was that for the charges that**

11  **were brought against you for the action that we're**

12  **talking about here today on --**

13     A.   Yes.  On July 19th.

14         **MR. CALLAHAN:**  Okay.  We'd move to enter 1

15  as well.

16         **MS. CONN:**  Objection, relevance.

17         **THE COURT:**  Okay.  Overruled.  Both 1 and

18  3 are admitted.

19         **(Whereupon, Respondent's Exhibit 1 was**

20  **offered and admitted into evidence.)**

21  **BY MR. CALLAHAN:**

22     **Q.    When Judge Rees in State court pronounced**

23  **his judgment of acquittal, did he state to you that**

24  **he found that your actions were protected political**

25  **speech under the Oregon Constitution?**

```
 1      A.    Yes.

 2      Q.    Is there anything else that you'd like to

 3 tell the Court today about this incident?

 4      A.    I view the TSA as a political

 5 organization.  I was sincere in my efforts to assist

 6 with my screening process and I take no

 7 responsibility for their actions.

 8           MR. CALLAHAN:  Nothing further, Your

 9 Honor.

10           THE COURT:  Okay.  Your witness.

11           MS. CONN:  Thank you.

12 CROSS-EXAMINATION

13 BY MS. CONN:

14      Q.    Mr. Brennan, you mentioned that in the

15 past you've been asked to remove your belt, your

16 shoes maybe your glasses or a sweater.  Did anyone

17 ever ask you to remove your pants?

18      A.    No.

19      Q.    And on that day no one asked you to remove

20 your pants?

21      A.    No.

22      Q.    Or your underwear?

23      A.    No.

24      Q.    And you said that you did that for

25 expedience sake to show that you didn't have
```

Case: 14-73502, 03/02/2015, ID: 9441793, DktEntry: 13-2, Page 96 of 99

1        A.    Yes.

2        Q.    **Okay.  Did anyone accuse you of carrying a**

3  **bomb or weapon on that day?**

4        A.    To me the -- the positive test was an

5  accusation.

6        Q.    **Okay.  But no one ever said that they**

7  **believed you had a bomb did they?**

8        A.    No.

9        Q.    **What did you think was going to happen**

10 **when you took off all your clothes?**

11       A.    That I would be cleared of the accusation

12 of having explosives and that I would be allowed to

13 go to my gate.

14       Q.    **That you would be allowed to go naked to**

15 **your gate?**

16       A.    Once I was cleared of the accusation that

17 I had explosives, I would have chosen to put my

18 clothes on and go to the gate.  And it was --

19       Q.    **But none -- excuse me.  Go ahead.**

20       A.    It was never explained to me that that was

21 necessary, that putting my clothes on was necessary

22 in order for me to complete my screening.

23       Q.    **But you were asked at least three times by**

24 **TSA to put your clothes back on, correct?**

25       A.    Yes.



NAEGELI

DEPOSITION AND TRIAL EXPERTS

800.528.3335

NaegeliUSA.com

1     Q.    And you were asked once or twice by the

2  police to put your clothes on?

3     A.    Twice.

4     Q.    Twice.  Thank you.  Did you consider the

5  effect of this on children in the area, having your

6  clothes off?

7     A.    I didn't.  I was aware of what the law is

8  and the law doesn't take children into account to my

9  knowledge in terms of my political speech.

10    Q.    Did you think about the potential for

11 people being -- TSOs being distracted by your

12 behavior in the performance of their duties?

13    A.    Actually not at all.  I'm aware that TSA

14 people routinely see people naked through the

15 scanning machines and that, in fact, the difference

16 between a naked image and a naked person isn't that

17 great once you get to that point.

18    Q.    And how do you know this information about

19 TSA --

20    A.    I've seen -- I'm sorry.

21    Q.    Go ahead.

22    A.    I've seen pictures online of scans.

23    Q.    And do you know the basis of that or the

24 accuracy of that?

25    A.    They're identified as TSA scans and, yeah,



*John Brennan v. U.S. Department of Homeland Security and Transportation Security Administration*
9th Cir. Case No. 14-73502

## CERTIFICATE OF SERVICE

I hereby certify that on this March 2, 2015, I electronically filed the foregoing

Petitioner's Excerpts of Records with the Clerk of the Court for the United States

Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system, and

to be served upon the following counsel through the CM/ ECF system:

| | |
|---|---|
| William Ernest Havemann | Sharon Swingle |
| DOJ - U.S. Department of Justice | DOJ - U.S. Department of Justice |
| Civil Division - Appellate Staff | Civil Division - Appellate Staff |
| Suite # 7515 | 950 Pennsylvania Avenue, N.W. |
| 950 Pennsylvania Avenue, N.W. | Washington, DC 20530 |
| Washington, DC 20530 | Email: Sharon.Swingle@usdoj.gov |
| Email: | |
| william.e.havemann@usdoj.gov | |

*s/ Michael E. Rose*
MICHAEL E. ROSE, OSB # 753221
Attorney for Appellant

///

///

///

///

///

///

I further certify that on the same date I served the foregoing Petitioner's

Excerpts of Records by sending a true copy via the United States Postal Service

First Class Mail and addressed to the following parties:

Stevan E. Bunnell                          Gillian Flory
Department of Homeland Security            Transportation Security
Office of the General Counsel              Administration
Mail Stop 3650                             TSA Headquarters
Washington, DC 20528                       601 S. 12th St.
                                           Arlington, VA 20598-6002


                                           *s/ Michael E. Rose*
                                           MICHAEL E. ROSE, OSB # 753221
                                           Attorney for Appellant